JOHNNIE FRANKLIN, ELAINE WILLIAMS, HELEN FERRIOLO, DIANE WOODWARD, LOTTIE JENKINS, MARIA VALENTIN, RUTH TOWNSEND, SHELIA FOY, MARGARET MATHIS, JAN-ICE LACEWELL, AND JACQUELINE CLARK, ON BEHALF OF THEMSELVES AND THEIR MINOR CHILDREN, APPEL-LANTS, v. NEW JERSEY DEPARTMENT OF HUMAN SERVIC-ES, RESPONDENT.

JANET MCCURDY, TANYA FERRELL, MARY HENDERSON, CA-THY HUGHES, HELEN MOORE, PATRICIA POWELL, AND ALFRED A. SLOCUM, PUBLIC ADVOCATE OF NEW JERSEY, APPELLANTS, v. NEW JERSEY DEPARTMENT OF HUMAN SERVICES, RESPONDENT.

Argued June 14, 1988—Decided June 24, 1988.

1

*Melville D. Miller, Jr.*, argued the cause for appellants Johnnie Franklin, et al. (*Melville D. Miller, Jr., Nancy Goldhill*, and *J. Harris David*, Legal Services of New Jersey; *Angelica F. Anaya–Allen*, and *Peggy Earisman*, Passaic County Legal Services; *Olga E. Bradford*, Camden Regional Legal Services; *Kenneth M. Goldman*, Cape–Atlantic Legal Services; *Theodore A. Gardner*, Hudson County Legal Services; *Connie M. Pascale*, Ocean–Monmouth Legal Services; *Joyce F. Helfman*, Middlesex County Legal Services; *Richard Foard, III*, Essex–Newark Legal Services, attorneys; *Melville D. Miller, Jr., Nancy Goldhill*, and *J. Harris David*, on the brief).

*David G. Sciarra*, Assistant Deputy Public Advocate, and *Richard E. Shapiro*, Director, Division of Public Interest Advocacy, argued the cause for appellants Janet McCurdy, et al. (*Alfred A. Slocum*, Public Advocate of New Jersey, attorney; *David G. Sciarra, Richard E. Shapiro, John P. Thurber, Shirley Brandman*, and *Susan R. Oxford*, Assistant Deputies Public Advocate, and *Louis S. Raveson*, of counsel; *David G. Sciarra, Richard E. Shapiro, John P. Thurber, Shirley Brandman*, and *Susan R. Oxford*, on the brief).

*Deborah T. Poritz*, Assistant Attorney General, argued the cause for respondent (*Cary Edwards*, Attorney General of New Jersey, attorney; *Deborah T. Poritz* and *William Harla*, Assistant Attorney General, of counsel; *Dennis J. Conklin, Ross*

*A. Lewin,* and *James T. Hill,* Deputy Attorneys General, on the brief).

*H. Curtis Meanor,* Acting Essex County Counsel, argued the cause for *amicus curiae* County of Essex (*H. Curtis Meanor,* attorney; *Wanda Douglas Thigpen,* Assistant County Counsel, on the brief).

*John M. Payne* submitted a letter brief on behalf of *amicus curiae* American Civil Liberties Union of New Jersey.

*Cecilia M. Zalkind* submitted a brief on behalf of *amicus curiae* Association for Children of New Jersey.

PER CURIAM.

We accelerated this appeal, which challenges the five-month expiration date for a certain form of emergency assistance (EA) benefits established under the program of Aid to Families with Dependent Children (AFDC). We set forth below our reasons for not now disturbing the Commissioner's decisions on how best to implement this program to avert the homelessness of families with dependent children. The need for a prompt decision will make this a somewhat abbreviated discussion of the competing claims. Consequently, our opinion is not intended as a definitive exposition of all the complex legal questions attendant to the challenge; rather, we resolve only those issues that are necessary to our judgment.

In essence, the plaintiffs argue that an arbitrary (i.e., fixed) expiration date for the program of emergency assistance violates their right to shelter for their dependent children as set forth in *N.J.S.A.* 44:10–1 to –8 (the State AFDC program) and in Article I, section 1 of the New Jersey Constitution, which provides that "all persons," and therefore children such as these, "have certain natural and inalienable rights," including that of "obtaining safety and happiness."

The New Jersey Department of Human Services (DHS) answers that setting a one-hundred-fifty-day expiration date for EA benefits does not mean that plaintiffs will inevitably be

deprived of shelter. The Commissioner of the Department points to a variety of programs and initiatives that he has undertaken in cooperation with other agencies of state or county government to create a "safety net" of programs that will address the needs of virtually all of the claimants. In addition the Commissioner points to the fact that the Legislature and the Governor recently committed to the problem $6.8 million in new appropriations; the budget forecast is that during the fiscal year beginning July 1, 1988, total spending by federal, state, and county agencies for programs to aid the homeless will approach $49 million, as compared with an estimated total program cost of $28.9 million for EA in the last fiscal year. Finally, the Commissioner represented to us that where necessary he could grant individualized extensions of the EA program's limit to ease the transition of claimants into the other programs. In the face of these representations we hold that the disputed regulation is not facially, or as currently applied, inconsistent with the statutory charge of the Department. Furthermore, on the record before us the proof of the likelihood of damage is not sufficient to trigger whatever constitutional rights might otherwise be asserted.

I.

This case concerns a small group of unfortunate families for whom emergency accommodations may be the last stop before the street. They are not the familiar single urban dwellers who seek shelter in bus or train stations when the street is inhospitable. Rather, they are drawn from that larger group of relatively intact families in cities and suburbs who receive some public assistance but not enough both to sustain decent housing and to meet their other basic needs. In his 1986 report (Ensuring the Needs of the Homeless), the Commissioner of the Department of Community Affairs (DCA) estimated this group to represent approximately fifty percent of those in need of shelter. Another thirty-five percent have experienced temporary setbacks in health or economic circumstances; a final

fifteen percent are the single men or women in the urban setting. Some understanding of the lives before us and of the programs in which they find themselves will be of assistance. In the words of Justice Brennan: "[I]n the bureaucratic welfare state of the late twentieth century, it may be that what we need most acutely is [to understand] * * * the pulse of life beneath the official version of events." Brennan, "Reason, Passion and the Progress of the Law," 42 *The Record of the Association of the Bar of the City of New York* 948 (1987) (*quoted in Jiggets v. Grinker*, 139 *Misc.*2d 476, 528 *N.Y.S.*2d 462, 468 (Sup.Ct. 1988)). For purposes of this appeal, we will refer to but a few lives of the original plaintiffs that demonstrate the "pulse of life" beneath the official version of events. The names of the people, but not the facts of their lives, have been changed.

### A.

Helen Heath was evicted from her Toms River apartment in 1987 when her husband failed to pay rent for two months while she was in the hospital. She is forty-four years old. Her parents are aged and cannot care for her. Her husband has since left her and her two teenage sons. She receives AFDC benefits for the two children. She wants a permanent home for them: "I search for housing every day. I constantly check the newspaper ads for rentals." To be sure, there is housing available, but the rents are usually between $550 and $650 per month. She receives $424 a month under the AFDC program. She is temporarily housed in an Ocean County hotel.

Mary Elmer had to leave an apartment to avoid exposing her two pre-school children to drugs in that environment. She searches for permanent housing in Newark, Linden, Orange, West Orange, and other urban areas. "I have been unable to locate safe and decent permanent housing I can afford." She is about to be evicted from a motel in Monmouth County. Rentals in Monmouth County "begin at $900 for a three-bedroom

apartment." Elsewhere she finds nothing less than $500. Her AFDC grant is $389 a month. She receives $150 in food stamps.

Antoinette Ellis is twenty-one years old; she lives in a Monmouth County motel. She may have herself to blame for many of her problems in that she was drug- and alcohol-dependent and "often moved from place to place." But her two children under two years of age must find shelter, clothing, and some incidentals out of $425 a month. Rents in the Elizabeth area where she wants to reside average between $450 and $500 per month. She receives $132 in food stamps.

Colleen Johnson is thirty-one years of age; she has three children. She lived in a barely habitable apartment in Newark. She could not stand to see her children exposed any longer to substandard housing conditions, but she could not find housing on her own. Her county agency placed her in a highway hotel in Monmouth County, New Jersey. She has no way to get around; there is no public transportation. Her children are taunted in their school district for being homeless. She sees no apartments for rent that are less than $600 per month. She receives $485 a month in AFDC benefits and $186 per month in food stamps.

These claimants do not want to perpetuate this system and live in one room in a highway hotel; the last thing in the world they want is to be isolated from family and friends. "Homelessness functions not as a freely chosen option but as a tragic, inexorable destiny." Connell, "A Right to Emergency Shelter for the Homeless Under the New Jersey Constitution," 18 *Rutgers L.J.* 765, 769 (1987) (footnote omitted). The problem arises primarily from the inexorable stress of a housing market that has outpaced their budgets. Everyone agrees on this point: "It is this structural problem of too little affordable housing that gives rise to most homelessness and that creates the need for emergency assistance in the State's AFDC pro-

gram." Report to the State Legislature by the Commissioner of the Department of Human Services dated March 10, 1988.

## B.

Before we address the legal issues, a brief review of the relevant programs is required. For this review we shall restate the descriptions set forth in several United States Supreme Court decisions.[1] The Federal Aid to Families with Dependent Children (AFDC) program is one of the oldest programs for aiding children. It was one of the four original "categorical assistance" programs established by the Social Security Act of 1935.[2]

Title IV–A of the Social Security Act now establishes several different public aid programs under the general rubric of "Grants to States for Aid and Services to Needy Families with Children." In order to receive federal funds under any of the Title IV–A programs a State must adopt a "state plan for aid and services to needy families with children" that is approved by the United States Department of Health and Human Services (HHS), as meeting the requirements set forth in § 402 of the Act.

AFDC is the core of the Title IV–A system. As the Supreme Court observed in one of its earliest analyses of Title IV, AFDC is a categorical aid program, and "[t]he category singled out for welfare assistance * * * is the 'dependent child,' who is defined

---

[1]Those decisions are *King v. Smith,* 392 *U.S.* 309, 88 *S.Ct.* 2128, 20 *L.Ed.*2d 1118 (1968); *Rosado v. Wyman,* 397 *U.S.* 397, 90 *S.Ct.* 1207, 25 *L.Ed.*2d 442 (1970); *Shea v. Vialpando,* 416 *U.S.* 251, 94 *S.Ct.* 1746, 40 *L.Ed.*2d 120 (1974); and *Quern v. Mandley,* 436 *U.S.* 725, 98 *S.Ct.* 2068, 56 *L.Ed.*2d 658 (1978).

[2]"The four categorical assistance programs are the Old Age Assistance (OAA), 42 *U.S.C.* § 301 *et seq.;* Aid to Families With Dependent Children (AFDC), 42 *U.S.C.* § 601 *et seq.;* Aid to the Blind (AB), 42 *U.S.C.* § 1201 *et seq.;* Aid For the Permanently and Totally Disabled (APTD), 42 *U.S.C.* § 1351 *et seq.*" *Rosado v. Wyman, supra,* 397 *U.S.* at 408 n. 10, 90 *S.Ct.* at 1215 n. 10, 25 *L.Ed.*2d at 453 n. 10.

in § 406 of the Act[ ] as an age-qualified 'needy child * * * who has been deprived of parental support or care by reason of the death, continued absence from the home, or physical or mental incapacity of a parent, and who is living with' any one of several listed relatives." *King v. Smith*, 392 *U.S.* 309, 313, 88 S.Ct. 2128, 2131, 20 *L.Ed.*2d 1118, 1123 (1968) (footnote omitted). A State's expenditures for AFDC, under an approved § 402 state plan, are reimbursed by the Federal Government according to the formula set forth in § 403(a)(1), currently at a level of fifty percent.

The AFDC program is designed to provide financial assistance to needy dependent children and to the parents or relatives who live with and care for them. A principal purpose of the program, as indicated by 42 *U.S.C.* § 601, is to help such parents and relatives "to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection * * *." The program "is based on a scheme of cooperative federalism." *King v. Smith, supra,* 392 *U.S.* at 316, 88 *S.Ct.* at 2133, 20 *L.Ed.*2d at 1125. As noted, it is financed by the Federal Government on a matching-fund basis.

Under federal Health and Human Services regulations all AFDC plans must specify a statewide standard of need, which is the amount deemed necessary by the State to maintain a hypothetical family at a subsistence level. Both eligibility for AFDC assistance and the amount of benefits to be granted an individual applicant are based on a comparison of the State's standard of need with the resources available to that applicant.

In most cases, then, an AFDC recipient receives a flat sum estimated to be sufficient to keep the recipient's family intact and personally independent. Theoretically, the AFDC grant includes a shelter component, *Rosado v. Wyman*, 397 *U.S.* 397, 90 *S.Ct.* 1207, 25 *L.Ed.*2d 442 (1970), together with other necessities such as food, clothing, utilities, transportation, and the like. *Id.* at 419, 90 *S.Ct.* at 1221, 25 *L.Ed.*2d at 459.

A federal "Emergency Assistance" program (EA) was added to Title IV as part of the omnibus Social Security Amendments of 1967. Pub.L. 90–248, § 206, 81 Stat. 893. It was described in the Senate Finance Committee report as "a new program optional with the States [to] authorize dollar-for-dollar Federal matching to provide temporary assistance to meet the great variety of situations faced by needy children in families with emergencies." S.Rep. No. 744, 90th Cong., 1st Sess. 4 (1967), U.S.Code Cong. & Admin.News 1967, pp. 2834, 2838.

To participate in the EA program a State must include a provision for EA in its § 402 state plan; federal funding at a flat rate of fifty percent of program expenses is authorized by § 403(a)(5). Unlike eligibility for AFDC, eligibility for EA is not limited to "dependent children." Instead, the term "emergency assistance to needy families with children" is broadly defined in § 406(e) to include money payments and other kinds of aid provided on a temporary basis "to avoid destitution * * * or to provide living arrangements" for a "needy child under the age of 21 who is * * * without available resources." 42 *U.S.C.* § 606(e)(1). Thus, under the EA statute federal matching funds are available for emergency aid to *intact* families with children, regardless of the cause of their need, if they are threatened with destitution.

There is a bitter irony in relating the current state of affairs to events of the recent past. In the early 1970s, New Jersey replaced its individualized need-based AFDC grants with a flat-grant system. Aid recipients then complained that a great number of recipients were living "in substandard housing," and thus that the average statewide "allowances for shelter [were] not fairly priced." *New Jersey Welfare Rights Org. v. Cahill,* 349 *F.Supp.* 501, 511 n. 7 (D.N.J.1972), *aff'd,* 483 *F.*2d 723 (3d Cir.1973). The difficulties then faced by the needy have only increased: since the low prices of yesterday's housing market have disappeared, it may be time to consider reinstituting a needs-based shelter component for AFDC.

Underlying the case before us is the curious anomaly that the EA program is vendor-based without many of the regulatory restrictions of AFDC. *See Quern v. Mandley*, 436 *U.S.* 725, 98 *S.Ct.* 2068, 56 *L.Ed.*2d 658 (1978). In *Quern*, the Court upheld the broad latitude by which Illinois sought to carve out an emergency assistance program only for AFDC recipients (rather than the broader EA class) to supplement the regular AFDC grant for "special needs items," including loss of shelter. Under EA, no fixed flat allowance for rent is set; the hotel bill is paid by the agency. It is this flexibility and open-endedness that poses the paradox for administrators who are paying thousands of dollars in rent under EA while required to maintain that the standard of need under AFDC is theoretically being met in that flat AFDC grant. See *Jiggets v. Grinker*, *supra*, 528 *N.Y.S.*2d at 468. (The cost of renting a room for a family of four at various hotels ranges from $1430 per month to $1825 per month, contrasted with claimants' allowance for rent of about $400 per month.)

New Jersey has long elected to participate in this program of cooperative federalism. The program appears in our laws of almost fifty years ago. *L.* 1938, *c.* 161. The current framework of our AFDC program for children in need is described in *Maticka v. City of Atlantic City*, 216 *N.J.Super.* 434, 446–47 (App.Div.1987). Under *N.J.S.A.* 44:10–3, the Commissioner of Human Services is "directed" to adopt "all necessary rules and regulations" and to do "all other * * * things necessary to secure * * * the maximum Federal financial participation that is available with respect to a program of aid to families with dependent children and otherwise to accomplish the purposes of this act." Like the counterpart federal program, the purposes of our Act are:

(1) To provide for the care of eligible dependent children in their own homes or in the homes of relatives, under standards and conditions compatible with decency and health,

(2) To help maintain and strengthen family life,

(3) To help such parents or relatives to attain the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection, and

(4) To provide for the care of a dependent child whose parents have been denied assistance under the provisions of [*N.J.S.A.* 44:10–2]. [*N.J.S.A.* 44:10–1(a).]

The regulation at issue here, enacted in pursuance of those purposes, embraces the emergency assistance authorized under 42 *U.S.C.* 606(e)(1) of Title IV of the Social Security Act. It is generally described in *Maticka, supra,* 216 *N.J.Super.* at 439. In that case the court found that the then-existing regulation with its administrative interpretation of the fault-based criterion of lack of adequate planning conflicted with the statutory goals of the AFDC program. It also found that, on the record before it, there was insufficient factual support to demonstrate that the ninety-day limit on emergency housing assistance was consistent with the stated goals of the AFDC program. 216 *N.J.Super.* at 455. The *Maticka* court directed the DHS to conduct further administrative hearings and to revise its regulation.

Consequently, following a rule-making proposal published on July 6, 1987, 19 *N.J.R.* 1171, and two rounds of public hearings, extensive amendments to *N.J.A.C.* 10:82–5.10 were adopted on November 16, 1987. 19 *N.J.R.* 2190. These amendments, which liberalized EA eligibility criteria and changed the maximum permissible period of EA benefits from three months to five months, generated a cost increase during FY 1988 and resulted in an estimated total program cost of $28,963,200. This increase created a deficit of approximately $15 million, which the Commissioner of Human Services is now attempting to diminish through savings in other program areas. The Governor has requested an appropriation of $12,081,888 for the EA program for FY 1989. (New Jersey fiscal years commence on July First and are denoted by the year of expiration.) This sum for EA together with other federal, state, and county expenditures will provide an overall commitment of $49 million for total programs for the homeless.

Following amendment of the EA regulations the Assembly directed the Commissioner of Human Services to report the results of those revisions and invited him to "transmit to the Legislature any recommendations he may have for legislative action that he deems necessary or expedient to render the program of emergency assistance more effective, efficient or equitable." (Assembly Resolution No. 63, January 28, 1988.) The resolution explicitly noted the Legislature's awareness that "the expiration of the first 90–day period [of Emergency Assistance] is near at hand" and further stated:

It is of intense concern to the Legislature to ascertain whether the provision made for emergency assistance to homeless persons and families be adequate for their needs and efficient in its administration, inasmuch as it is the duty and responsibility of the Legislature to establish a sound basis in law for the provision of such services * * *.

On March 10, 1988, Commissioner Altman submitted his report to the Legislature on the effects of the EA regulations adopted in the wake of the Appellate Division's decision in *Maticka, supra.* He stated that the EA program "is intended to provide emergency, time-limited assistance to individuals on AFDC. It was not intended to be, and cannot be, the solution to the low-income housing problem." The Commissioner also noted that a number of the recent changes in EA have substantially liberalized the program by: revising the so-called "fault standard," thereby tripling the number of eligible families; extending the duration of EA for two additional months; tripling spending on EA from $9.1 million in FY '87 to almost $30 million in FY '88, thus creating a $15 million deficit that must be trimmed by cutting expenditures on other programs; maintaining AFDC benefits levels when a family also receives EA (this policy has since been reconsidered); forming a homeless advisory group to advise DHS on how to improve the operation of EA; maintaining EA benefits pending the appeals of individuals denied the two-month extensions; and assigning twenty-four-hour Division of Public Welfare (DPW) and Division of Youth and Family Services (DYFS) staff workers to assist the county welfare agencies (CWAs) and the homeless families.

Consequently, the DHS concluded that EA should not be converted into a permanent housing subsidy because such an open-ended program fails to address the underlying causes of homelessness, creates an unfunded liability in the AFDC program, diverts funding from increasing the supply of affordable housing, and may serve to institutionalize "welfare hotels."

In late April, the DHS announced a package of initiatives to assist counties in placing families who are temporarily housed in welfare hotels. This package included provisions for a one-month, one-time gap funding to the county welfare agencies to maintain those families scheduled to lose their benefits on April 30, 1988; a one-million-dollar allocation to the County Homelessness Grant Program; and a home-finding fee for nonprofit organizations that locate housing arrangements for EA families.

The plaintiffs are homeless residents of this State's shelters and welfare hotels; after receiving notices of prospective termination of their Emergency Assistance (EA) benefits, they challenged the recently-enacted five-month maximum for emergency shelter assistance. This Court granted plaintiffs' motion for a stay of the termination of EA benefits pending the Appellate Division's accelerated disposition of the matter. A divided court upheld the regulation, 225 *N.J.Super.* 504 (1988); plaintiffs now appeal as of right, *R.* 2:2–1(a)(2).

Before us, the Commissioner urged that we especially consider as indicative of the Legislature's intent the recent enactment of two bills appropriating funds for homeless assistance. *L.* 1988, *c.* 29, and *L.* 1988, *c.* 30. In signing these bills into law, the Governor simultaneously exercised his line-item veto power to reduce the amount of the appropriations and to redirect the allocations.

As passed by the Legislature, *L.* 1988, *c.* 29, called for a supplemental appropriation of $5.65 million for three separate homelessness programs administered by the Department of Community Affairs (DCA). In reducing the total appropriation

to $3.15 million, the Governor noted that "although more money should be made available for programs to benefit the homeless * * * State resources are not without limit" and competing demands should be "evaluated in a comprehensive rather than a piecemeal manner" in the regular budget process. These funds were allocated to the DCA's Homelessness Prevention Program. *N.J.S.A.* 52:27D–280 to –287. This program is designed to assist in the prevention of homelessness by providing emergency accommodations, rental assistance grants, and interest rate subsidies to low- and moderate-income families.

The companion legislation, *L.* 1988, *c.* 30, would have provided $8.05 million to the DHS for homeless and other programs. The Governor reduced the total appropriation to $3.65 million and redirected a portion of these funds. Specifically, $1 million was authorized for the Comprehensive Emergency Assistance System (CEAS). This program is comprised of county-level committees, which are the primary vehicles for planning and coordinating emergency services for the homeless. The Governor also retained a $2.65 million allocation to the Division of Public Welfare to assist EA families. The Governor stated that "[b]y redirecting these monies so that they may be used to help families currently enrolled in the Emergency Assistance Program, it is my hope that every family now living in a welfare motel will have a home."

With these recent appropriations the Commissioner is confident that the new initiatives and programs will enhance the State's ability to resolve the problem of homelessness. Under the County Homelessness Assistance Grant Program, for example, the Departments of Human Services and Community Affairs jointly provide support to the counties to assist those families that have exhausted their five-month maximum entitlement to EA. As noted, there was a one-time, one-month extension of EA for those families. Moreover, the State has made $1 million available to the counties for the County Homelessness Assistance Grant Program. Each County Welfare

Agency will receive a grant allocated on the basis of a formula that takes into account both the number of EA clients whose benefits expire and the total numbers of EA cases. The grant is to be used by the CWA in the manner that the agency considers most effective to address the needs of its eligible recipients: for example, rental subsidies or, if need be, continued payments for temporary shelter. In order to facilitate the placement of such families in permanent housing, the counties have also been encouraged to consider a time-limited rental subsidy program. Of course, this program was targeted at that one-time group of EA recipients whose benefits were to have expired on March 31, 1988, but the program has the capacity for further implementation; the DHS has expressed its hope that this initiative can be a model for continuing programs to be implemented at the county level.

Essex County counsel argued before us, as did the Public Advocate, that the shift of responsibility to the counties will result in the implementation of various unequal approaches to homelessness, despite State and federal requirements of a uniform plan. That argument forecasts results as yet unresolved on this record. More significant may be the argument that the State plan has the effect of shifting costs to the counties without providing the necessary appropriations. These are questions, however, more of inter-governmental structure than of constitutional or statutory entitlement.

As the Commissioner asserted in his testimony before two Congressional subcommittees, it is self-evident that EA, as currently administered, is a most inefficient method of providing shelter for the homeless: the average EA cost of $1200 per month per family could instead provide rental assistance to place a family in permanent housing for over a year and a half. The Commissioner thus sees the need for even more reform and greater flexibility in this area. In his view, the EA program should be modified to allow states to use EA funds in a more

flexible manner, i.e., to provide rental subsidies, family shelter, and home-finding services. Commissioner Altman's remarks were motivated in part by a proposal to limit federal matching funds for EA to thirty days. Under current federal regulations, the federal government funds fifty percent of the cost of EA for up to ninety days in any twelve-month period. However, there appears to be some uncertainty about the availability and extent of federal funding for the more flexible EA options sought by the DHS. In any event, the Commissioner emphasized the need for a renewed and expanded federal commitment to provide for the housing needs of the poor.

All appear hopeful that new solutions can be found; a more flexible shelter allowance in the basic AFDC grant would go a long way toward resolving some of these problems. This alternative would have the additional advantage of assuring the best use of available federal funds, and would thus lessen the burden on counties.

In view of these initiatives, the Commissioner urges that these programs be given a chance to work. He quite wisely observes that the realities of human experience suggest that without an expiration date for the EA program, the needs will expand to fit the program. Of all the solutions to the problem of housing the homeless, the welfare hotel is probably the worst.

## II.

Courts have but a limited role in reviewing the actions of other branches of government. *See Dougherty v. Department of Human Servs., Div. of Medical Assistance and Health Servs.* 91 *N.J.* 1 (1982) (defining role of courts in reviewing agency action). Thus we generally recognize that an agency charged with the implementation of a statutory program must have a broad range of discretion to implement the program

even when there is no express direction on the issue. See *GATX Terminals Corp. v. Department of Envtl. Protection*, 86 *N.J.* 46, 52 (1981) (agency charged with cleanup of hazardous material has authority to set standards for storage). Hence the Commissioner's decision how best to employ the EA program should be and is entitled to judicial deference until it is shown plainly to conflict with the legislative goals of the AFDC program.

"To declare a statute [or its implementation] unconstitutional is a judicial power to be delicately exercised." *Harvey v. Essex County Bd. of Freeholders*, 30 *N.J.* 381, 388 (1959). "[A] legislative act [should] not be declared void unless its repugnancy to the constitution is clear beyond reasonable doubt." *Gangemi v. Berry*, 25 *N.J.* 1, 10 (1957). The claim that the agency action here conflicts with a constitutional right is far from clear "beyond a reasonable doubt." In other cases we have stayed our hand when the ultimate resolution of important statutory and constitutional issues turned on complex factual considerations not fully developed in the record. *Democratic Party of New Jersey, Inc. v. Collins*, 109 *N.J.* 521 (1987); *Mortgage Bankers Ass'n v. New Jersey Real Estate Comm'n*, 102 *N.J.* 176, 179 (1986); *State v. Matulewicz*, 101 *N.J.* 27, 29 (1985); *Abbott v. Burke*, 100 *N.J.* 269, 299 (1985). Hence, we do not reach the constitutional issues addressed by the court below except to note that even were we to find such an obligation, we would generally hold that the Legislature has broad discretion in determining how best to "vindicate * * * a constitutional obligation." *Hills Dev. Co. v. Bernards Township*, 103 *N.J.* 1, 21 (1986). And added to that principle here is the recognition by the other branches of government of a continuing responsibility in this area. The County of Essex, although concerned about the fiscal implications, quite commendably represented to the Court that it had no intention of walking away from these families. Hence, the record bespeaks the concern of other

branches of state government and of local government for the homeless.

In the face of the "myriad, extraordinary and complex factual issues presented," *Abbott v. Burke, supra,* 100 *N.J.* at 300 (declining to declare invalid state program to implement guarantee of thorough and efficient education), the Court should hesitate to invalidate a legislative program before that program has had a chance to be tested. We recognize, as did the dissenting member of the Appellate Division below, that "the Damoclean sword of the five-month limit" is not essential to implement the alternative programs. 225 *N.J.Super.* at 545 (Pressler, J.A.D., dissenting). Still, a court should not invalidate the actions of another agency of government except on the plainest and clearest of grounds. Should the problem of homelessness of children not prove amenable to solution by these alternatives, the questions will remain whether the Commissioner has shaped the AFDC program to meet the declared legislative purposes of preserving and protecting families of dependent children "in their own homes," *N.J.S.A.* 44:10-1(a)(1), and whether any constitutional rights have been violated.

We recognize, as plaintiffs' counsel did, the limitations on the power of the Court with respect to appropriations. *Camden v. Byrne,* 82 *N.J.* 133, 148–50 (1980). In this case we have some doubt that the Legislature's response to the Commissioner's initiatives evidences an acquiescence in his determination that EA benefits are terminable. There are grave implications of the Commissioner's policy, one of which is the suggestion that the shelter of last resort for children be foster care; that policy would not only result in the breakup of families but would further burden an already overloaded foster-care system. It may be too late in the current budget cycle to present these

questions to the Legislature and the Governor. Obviously, a clear identification of the agency or program of government that is to provide shelter of last resort to dependent children and their parents (there is confusion in this regard over whether DCA, DHS, or county or local government is ultimately to be responsible to provide shelter of last resort), and a clear statement of the resources that shall be dedicated to that end would do much to clarify the present situation.[3] All agree that these children should not become bureaucratic orphans.

Recognizing to some extent the as-yet tentative posture of the case, plaintiffs seek a declaration of their rights. At the same time, their counsel were candid to express their respect for the concern that the Governor and the Legislature have shown for their needs. No more direct declaration can be found than in the Governor's own words:

> I believe that, with these steps, our state and our society can move toward the goal outlined by the Task Force, namely that "all persons, regardless of fault, are entitled to the basic human needs for shelter and food and it is the obligation of government to ensure that these needs are met." [Report of the Governor's Task Force On the Homeless, October 1985, Appendix C.]

The Governor's statement mirrors as well the declaration of legislative policy in the Prevention of Homelessness Act, *N.J. S.A.* 52:27D–280 to –287: "It is the longstanding policy of this State that no person should suffer unnecessarily from cold or hunger, or be deprived of shelter." *N.J.S.A.* 52:27D–281a.

Everyone agrees that the spectacle of housing a family in a hotel room offends even the most callous of us. *N.J.S.A.* 44:10–1(a)(1) states as the purpose of AFDC the care of children "in their own homes or in the homes of relatives," not in hotels.

---

3DHS has recognized that the needs of the homeless have outpaced its initial budget plans. Thus, it appears the Commissioner does not believe that the Legislature intended to spend on the unfolding needs of the homeless only so much money as it had already appropriated. The Commissioner has noted that although in FY 1988 the Legislature appropriated only $5.8 million for the EA program, he has been obliged to spend $11.29 million on the homeless.

The Commissioner's plans seek to get these children out of hotels sooner and not later.

The Commissioner has not abandoned these children; he has expressed before us an intent to exercise a supervising responsibility with respect to identifying funding and coordinating solutions to the problem of housing homeless families. For him, the impetus to set a termination date for EA stems from a desire to find better housing solutions. In sum, then, the question that we have been presented with is whether it is legal to terminate the emergency aid to the homeless families of dependent children after five months, if other programs, formal and informal, are in place to make reasonably certain that the families previously housed in motels will find shelter and eventually housing elsewhere. The answer to that question is obviously yes.

Hence, for the reasons stated in the opinion we uphold on the record before us the validity of the regulation under challenge. In the last analysis, this is a matter best resolved by the legislative and executive branches in concert with the community at large. Obviously, these matters will be under continued scrutiny by those branches of government. The report and legislative recommendations requested of the Commissioner pursuant to Assembly Resolution No. 63 (January 28, 1988), on the effects "experienced to date and anticipated for the future" of the revised EA regulation, contemplate a follow-up on whether the programs that are in place are achieving the AFDC goals.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI, and STEIN—7.

*For reversal*—None.