289 N.J. Super. 575 (1996)
674 A.2d 625
STATE OF NEW JERSEY IN THE INTEREST OF J.G., N.S., AND J.T.
Superior Court of New Jersey, Appellate Division.
Argued October 31, 1995.
Decided April 22, 1996.
*577 Before Judges ARNOLD M. STEIN, KESTIN and CUFF.
*578 Lisa Sarnoff Gochman, Deputy Attorney General, argued the cause for appellant, State of New Jersey (Deborah T. Poritz, Attorney General, attorney; Ms. Gochman, of counsel and on the brief).
Ruth Bove Carlucci, Assistant Deputy Public Defender, argued the cause for respondents, J.G., N.S. and J.T. (Susan L. Reisner, Public Defender, attorney; Ms. Carlucci, of counsel and on the brief).
John V. Jacobi argued the cause for Amicus Curiae The American Civil Liberties Union of New Jersey (Crummy, Del Deo, Dolan, Griffinger & Vecchione, attorneys; Mr. Jacobi and Lenora M. Lapidus on the brief).
The opinion of the court was delivered by CUFF, J.A.D.
This appeal involves a challenge to two statutes, N.J.S.A. 2A:4A-43.1 and N.J.S.A. 2C:43-2.2, which require AIDS and HIV testing upon request of the victim of those defendants who have been charged, indicted, convicted, or adjudicated delinquent of either sexual assault or aggravated sexual assault. In this case, the three juveniles have been adjudicated delinquent for acts which, if committed by an adult, would constitute aggravated sexual assault. After an evidentiary hearing at which defendants presented three expert witnesses, the trial judge held the statutes unconstitutional, facially and as applied, as an unreasonable search under the Fourth Amendment. Consequently, the State's request for an order compelling defendants to submit to such testing was denied. We reverse.
On July 13, July 20, and October 18, 1994, juvenile delinquency complaints were filed against thirteen-year old J.G., fourteen-year old N.S., and fifteen-year old J.T., respectively, in the Family Part charging them with acts which, if committed by an adult, would constitute aggravated sexual assault in violation of N.J.S.A. 2C:14-2a(1) on C.H., a ten-year old girl. Specifically, defendants were *579 charged with forcing C.H. to engage in anal intercourse and fellatio on May 7, 1994. On August 16, 1994, the State made an oral application for an order compelling J.G. and N.S. to submit to a mandatory test for HIV. After J.T. was charged, the State applied to have him tested. By order dated October 5, 1994, the American Civil Liberties Union was permitted to appear as amicus curiae.
On November 29 and 30, 1994, an evidentiary hearing was conducted at which defendants presented the testimony of three expert witnesses. The State presented no witnesses. Subsequently, each juvenile pled guilty to aggravated sexual assault: J.T. on January 18, 1995; N.S. on January 20, 1995; and J.G. on February 23, 1995.
Two tests are used in combination to determine whether a person has been exposed to the HIV virus. One is the enzyme-linked immuno-sorbent assay (ELISA). If the result of that test is positive, a second procedure, the Western Blot test, is performed to confirm the initial result. The tests are considered reasonably accurate. The tests do not detect the virus itself but the body's serological response to the virus. It also usually takes anywhere from three to six months after infection before an immunological response is detected in the body. Thus, because of a latency period of variable length during which the individual does not produce antibodies in response to the HIV virus, a negative test does not necessarily mean that the assailant is not infected with the virus.
James Oleske, a Professor of Pediatrics at the University of Medicine and Dentistry  New Jersey Medical School, testified that positive ELISA and Western Blot tests have a very high predictive value that the tested individual is infected with HIV. However, Dr. Oleske opined that testing alleged sexual assault assailants for HIV is not beneficial for either the diagnosis or the treatment of the victim because the test would not reveal the HIV status of the assailant at the time of the assault. His treatment of the victim would not be affected by the HIV status of the assailant *580 because not every sexual encounter results in infection and because it usually requires multiple exposure to the virus to result in infection. Furthermore, a negative result would not necessarily mean that the assailant was not infected because of the window period. He also noted that the report of a false negative, due to the effect of the window period, could actually prove harmful to the victim because the victim may discontinue testing for the virus.
Jill Greenbaum, Executive Director of the New Jersey Coalition Against Sexual Assault, has extensive experience in counselling sexual assault victims. She testified that knowledge of the assailant's HIV status is not psychologically beneficial to the victim. She opined that a sexual assault victim must separate herself from the assailant. She also agreed that knowledge of the assailant's HIV status is not informative of the victim's HIV status. She concurred with Dr. Oleske that, if the result of the assailant's test is negative, the victim may discontinue subsequent testing to her detriment.
Patricia Kliser, Medical Director of AIDS Services at University Hospital and an Associate Professor of Clinical Medicine and Preventive Medicine at New Jersey Medical School, opined that HIV testing of the assailants is of no medical benefit to the victim and would be of no use in determining the appropriate diagnosis and treatment for the victim.
In a reported decision, State in the Interest of J.G., 283 N.J. Super. 32, 660 A.2d 1274 (Ch.Div. 1995), the trial judge found that:
1) Testing the juveniles for HIV infection would be of no use in the diagnosis of the victim.
2) Testing the juveniles would provide no benefit in the medical treatment of the victim of sexual assault.
3) Testing the juveniles would provide no benefit in the psycho-social recovery of the victim of sexual assault.
[Id. at 48-49, 660 A.2d 1274.]
The trial judge also noted that the mandatory blood test to determine the assailant's HIV status required by N.J.S.A. 2A:4A-43.1 *581 and N.J.S.A. 2C:43-2.2 implicated the Fourth Amendment guarantee against unreasonable searches and seizures. Id. at 49, 660 A.2d 1274. He also determined that the appropriate analysis of the Fourth Amendment issue was the "special needs" analysis articulated in Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), and National Treasury Employees Union v. Von Raab, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). State in the Interest of J.G., supra, 283 N.J. Super. at 50, 660 A.2d 1274.
In applying this analysis, the trial judge found that the intrusion on the juveniles' guarantee against unreasonable searches and seizures was substantial. Id. at 51, 660 A.2d 1274. In addition, the trial judge observed that
any compulsory medical procedure must be deemed extremely invasive of an individual's right to determine what, if anything, will be done to his body. It is difficult to imagine a search and seizure more intrusive than forcing an individual to first submit to the withdrawal of blood from his body, and then testing that blood for a disease which subjects those who have it to widespread and invidious discrimination, and then revealing the results of that test to an individual who is free to pass that information on to whomever she wishes.
[Id. at 52, 660 A.2d 1274.]
The trial judge also noted that assisting victims of sexual assault and other crimes is a legitimate and compelling governmental interest. Ibid. However, because the medical testimony established that HIV testing of the assailant is of no medical benefit or utility in the diagnosis and treatment of the victim, the bodily intrusion of the assailant and the impairment of his right against an unreasonable search and seizure is unnecessary to achieve the state interest. Id. at 54, 660 A.2d 1274. Thus, the trial judge declared N.J.S.A. 2C:43-2.2 and N.J.S.A. 2A:4A-43.1 unconstitutional, facially and as applied, as a violation of the juveniles' rights under the Fourth and Fourteenth Amendments of the United States Constitution. Id. at 55, 660 A.2d 1274.
N.J.S.A. 2C:43-2.2a provides:
In addition to any other disposition made pursuant to law, a court shall order a person convicted of, indicted for or formally charged with, or a juvenile charged *582 with delinquency or adjudicated delinquent for an act which if committed by an adult would constitute, aggravated sexual assault or sexual assault as defined in subsection a. or c. of N.J.S. 2C:14-2 to submit to an approved serological test for acquired immune deficiency syndrome (AIDS) or infection with the human immunodeficiency virus (HIV) or any other related virus identified as a probable causative agent of AIDS. The court shall issue such an order only upon the request of the victim and upon application of the prosecutor made at the time of indictment, charge, conviction or adjudication of delinquency. The person or juvenile shall be ordered by the court to submit to such repeat or confirmatory tests as may be medically necessary.[1]
N.J.S.A. 2A:4A-43.1 provides:
In accordance with section 4 of P.L. 1993, c. 364 (C.2C:43-2.2) and in addition to any other disposition authorized pursuant to N.J.S. 2A:4A-43, a court shall order a juvenile charged with delinquency or adjudicated delinquent for an act which if committed by an adult would constitute aggravated sexual assault or sexual assault as defined in subsection a. or c. of N.J.S. 2C:14-2 to submit to an approved serological test for acquired immune deficiency syndrome (AIDS) or infection with the human immunodeficiency virus (HIV) or any other related virus identified as a probable causative agent of AIDS.
These statutes were enacted as part of an act which established standards to insure the rights of crime victims. L. 1993, c. 364. Although this law contains no specific legislative findings concerning the necessity of or benefits to be derived from testing of assailants for HIV, we know that the testing provisions of the law were enacted in response to a federal mandate. In reporting favorably on the bill, the Senate Judiciary Committee noted:
In order to avoid the loss of federal grants currently received for victim support services, states are required to enact a statute requiring persons convicted of sexual assault to be tested at the victim's request for AIDS or HIV infection.[2]
[Senate Judiciary Committee, Statement to Assembly Bills Nos. 897 and 220 (June 14, 1993).]
To declare a statute unconstitutional is a judicial power which must be exercised delicately. Harvey v. Essex County Bd. of Freeholders, 30 N.J. 381, 388, 153 A.2d 10 (1959). This power *583 should be exercised only when the legislation's repugnance to the constitution is clear beyond a reasonable doubt. Franklin v. New Jersey Dep't of Human Servs., 111 N.J. 1, 17, 543 A.2d 1 (1988); Gangemi v. Berry, 25 N.J. 1, 10, 134 A.2d 1 (1957). Generally, a court must sustain an act subject to constitutional attack, if any state of facts may reasonably justify the act. ADA Fin. Serv. Corp. v. State, 174 N.J. Super. 337, 346, 416 A.2d 908 (App.Div. 1979). Justice Heher has stated: "The court is not at liberty to appraise the information available to the legislative department as if that inquiry were a judicial proceeding." Reingold v. Harper, 6 N.J. 182, 195, 78 A.2d 54 (1951). Legislation is presumed valid and based on adequate factual findings. This presumption can be overcome only by proofs that preclude the possibility that there could be any set of facts known to the legislature or which could reasonably be assumed to have been known which rationally support a conclusion that the bill is in the public interest. It is not the judiciary's function to weigh the evidence for and against the enactment nor review the wisdom of the Legislature's action. Hutton Park Gardens v. West Orange Town Council, 68 N.J. 543, 565, 350 A.2d 1 (1975). The presumption is particularly daunting when a statute attempts to protect the public health. Matter of C.V.S. Pharmacy, 116 N.J. 490, 497, 561 A.2d 1160 (1989), cert. denied, 493 U.S. 1045, 110 S.Ct. 841, 107 L.Ed.2d 836 (1990). In light of this presumption of validity, the party attacking the legislation must negate every conceivable basis which may reasonably support the bill. Fair Housing Council v. New Jersey Real Estate Comm'n, 141 N.J. Super. 334, 338, 358 A.2d 221 (App.Div.), certif. denied, 71 N.J. 526, 366 A.2d 681 (1976).
Defendants argue that the trial court's ruling concerning the constitutionality of the challenged statutes must be affirmed because that decision was predicated on findings of fact derived from an extensive and undisputed evidentiary record. Citing Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 323 A.2d 495 (1974), they insist these findings are entitled to great deference. The State argues that the factual findings by the trial judge are *584 entitled to no deference. In fact, the State argues that the trial judge should not have conducted an evidentiary hearing.
The taking of testimony is not the problem. Indeed, we note that other courts faced with a constitutional challenge to a statute requiring HIV testing of various offenders have conducted evidentiary hearings. See, e.g., Johnetta J. v. Municipal Court, 218 Cal. App.3d 1255, 267 Cal. Rptr. 666 (1990); People v. Adams, 149 Ill.2d 331, 173 Ill.Dec. 600, 597 N.E.2d 574 (1992). Further, a judge is always free to inform himself or herself of a foreign or technical area either through testimony or through an examination of the literature. Rather, the difficulty is the weight accorded this testimony by the trial judge in light of a legislative determination that such testing is in the public interest.
No New Jersey appellate court has addressed the Fourth Amendment issue raised by this appeal.[3] Several jurisdictions, including California, Washington, Illinois and Florida have examined similar statutes and have upheld the statutes from a similar constitutional attack.
In Johnetta J., supra, a California statute requires any person convicted of assaulting a law enforcement officer in a manner which involved the transfer of blood or other bodily fluids to submit to a mandatory HIV blood test. 267 Cal. Rptr. at 668-69. The results of the test shall be made available to the defendant and the victim. Id., at 669. If the test is positive, the test result shall also be forwarded to the state health department. Ibid. The court noted that a constitutional attack on this testing scheme is best addressed by the "special needs" analysis. Id., at 680. In applying the "special needs" analysis, the court held that the government's interest in protecting the health and safety of its *585 employees is compelling and overrides the assailant's right to be free from a blood test which may reveal devastating information regarding the assailant's health. Id., at 680-82. Against a strong argument which seriously questioned the practical utility of the testing, particularly as an indicator of the victim's HIV status, the court noted that the lack of conclusiveness does not undermine the government interest and noted that the wisdom of the legislation was not an issue to be resolved by a court. Id., at 682, 685.
In Adams, supra, the Illinois Supreme Court upheld the constitutionality of a statute requiring convicted prostitutes to submit to mandatory blood tests to detect sexually transmitted diseases, including HIV. As in Johnetta J., defendant challenged the utility of the testing requirement through the testimony of medical experts. Adams, supra, 173 Ill.Dec. at 603, 597 N.E.2d at 577. As in this case, the parties conceded that the taking and testing of blood is a search under the Fourth Amendment. Id. at 579. As in Johnetta J., the court concluded that the reasonableness of the search should be evaluated pursuant to the "special needs" analysis. Id., at at 580.
Pursuant to this analysis, the court noted that the HIV testing requirement advances a special governmental need to protect the public from a deadly transmittable disease because it allows infected persons to be identified, treated, counselled and provided with an opportunity to modify their behavior, which in turn may interrupt the transmission cycle of the virus. Id., at 581. This special governmental need was found to outweigh the individual privacy interest and the individual's interest in requiring some degree of individualized suspicion. Id., at 582. The court noted that a discussion of the merits and demerits of mandatory testing of at-risk groups, a primary focus of the parties challenging the constitutionality of the Illinois statute, and as well as our statutes, was not irrelevant to its inquiry but observed that such a discussion was better directed to the legislature than to the court. Id., at 583.
*586 In In the Matter of Juveniles A, B, C, D, E, 121 Wash.2d 80, 847 P.2d 455 (1993), the Supreme Court of Washington, sitting en banc, also upheld the constitutionality of a mandatory HIV testing scheme utilizing the "special needs" analysis. This scheme applies to anyone, juvenile or adult, convicted of a sexual offense, even an offense which does not involve the transmission of bodily fluids. Id., at 457. The court found to be compelling the state's interests in combating the spread of AIDS, protecting the rights of victims, aiding effective prison and probation management, and allowing timely and appropriate treatment to the offenders. Id., at 460-61. The inconclusive nature of the tests does not diminish the state's interest. Id., at 461. The fact that a test may be required for conviction of an offense incapable of transmitting the virus also does not render the scheme constitutionally infirm. Id., at 461-62. The court reasoned that the Legislature could reasonably conclude that sexual offenders are a high-risk group for exposing others to the virus. Id., at 461.
The constitutionality of a Florida statute requiring a person charged with sexual battery to submit to a mandatory blood test for HIV has also recently been upheld. See Fosman v. State, 664 So.2d 1163 (Fla. Dist. Ct. App. 1995). The court applied the Skinner/Von Raab "special needs" analysis and found the governmental interest in the health of its citizens substantially outweighed the individual interest to be free from the bodily intrusion of a blood test. Id. at 1165-66; see also Government of the Virgin Islands v. Roberts, 756 F. Supp. 898 (D.Vi. 1991); People v. Cook, 143 A.D.2d 486, 532 N.Y.S.2d 940, appeal denied, 73 N.Y.2d 786, 536 N.Y.S.2d 746, 533 N.E.2d 676 (1988); People v. Thomas, 139 Misc.2d 1072, 529 N.Y.S.2d 429 (Schoharie Cty. Ct. 1988).
Statutes requiring mandatory HIV testing of sex offenders and the decisions which have sustained the constitutionality of these statutes, particularly Johnetta J. and Matter of Juveniles, have been the subject of substantial criticism. See, e.g., Barbara Danko, Comment, The Fourth Amendment's Challenge to Mandatory *587 Aids Testing of Convicted Sexual Offenders  Has the AIDS Virus Attacked Our Constitutional Right to Privacy? 4 Seton Hall Const. L.J. 279 (1993); Paul H. MacDonald, Note, AIDS, Rape, and the Fourth Amendment: Schemes for Mandatory AIDS Testing of Sex Offenders, 43 Vand. L.Rev. 1607 (1990); Bernadette Pratt Sadler, Comment, When Rape Victims' Rights Meet Privacy Rights: Mandatory HIV Testing, Striking the Fourth Amendment Balance, 67 Wash. L.Rev. 195 (1992); Christine M. Stevenson, Note, In the Matter of Juveniles A, B, C, D, E: Analyzing the Rights of Individuals By Junkyard Standards, 11 J. Contemp. Health L. & Pol'y 281 (1994). The consensus of these commentaries is that the statutes are based on lack of information or upon misinformation, if not upon bad medicine. Thus, these articles reason that in any weighing of private versus governmental interests, the governmental interest must fall, since it is founded on a misconceived or faulty premise. Not all commentaries, however, are negative. See Wayne R. LaFave, Search and Seizure § 5.4(c) (1996); Kevin A. McGuire, Comment, AIDS and the Sexual Offender: The Epidemic Now Poses New Threats to the Victim and the Criminal Justice System, 96 Dick. L.Rev. 95 (1991).
Unquestionably, the mandatory removal of blood and its analysis to detect HIV constitutes a search, not only because of the physical invasion of a defendant's body, but also because it will reveal private medical information. Skinner, supra, 489 U.S. at 616, 109 S.Ct. at 1412-13, 103 L.Ed.2d at 659. The issue is whether the search is reasonable. Id. at 618-19, 109 S.Ct. at 1414, 103 L.Ed.2d at 660-61.
The trial judge correctly determined that the appropriate analysis is the "special needs" analysis articulated in Skinner. The "special needs" doctrine is applicable where special needs, beyond the normal need for law enforcement, make the warrant and probable cause requirements impracticable. Id. at 619, 109 S.Ct. at 1414, 103 L.Ed.2d at 661. This analysis requires the court "to balance the governmental and privacy interests to assess the practicality of the warrant and probable cause requirements in the *588 particular context." Ibid. The same holds true with respect to the requirement of showing individualized suspicion in the absence of probable cause:
[A] showing of individualized suspicion is not a constitutional floor, below which a search must be presumed unreasonable. In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion.
[Id. at 624, 109 S.Ct. at 1417, 103 L.Ed.2d at 664 (citations omitted).]
Although the statutes under review are not accompanied by specific legislative findings, the state's interest in the health and safety of its citizens is a compelling interest. West Caldwell v. Caldwell, 26 N.J. 9, 30, 138 A.2d 402 (1958). The state's interest in obtaining information of the HIV status of accused or convicted sex offenders is readily apparent. The most obvious interest is protection of the rights of victims. Moreover, the information concerning the assailant's status may ease the victim's anxiety concerning the transmission of disease or may propel the victim to conscientiously monitor his/her own status. A properly counselled victim will have been told that he/she must continue personal HIV surveillance. Moreover, we are hesitant to dismiss a victim's desire to know the HIV status of his/her assailant because a psychologist deems such information not in his/her best interest. The information derived from such testing also has readily discernible collateral, although unarticulated, benefits. The information can aid in effective prison and probation management of the offenders, including appropriate treatment and counselling, if the offender is infected.
The state's interests must be balanced against the individual's interest. The physical intrusion of a needle to obtain a blood sample is slight. The actual test is a minor, routine laboratory procedure. Schmerber v. California, 384 U.S. 757, 771, 86 S.Ct. 1826, 1836, 16 L.Ed.2d 908, 920 (1966). The test itself poses no threat to the health or safety of the defendant and disclosure of the test results is tightly controlled. Moreover, defendants have a *589 reduced expectation of privacy due to their status as adjudicated delinquents. See, e.g., Fosman, supra, 664 So.2d at 1166; Adams, supra, 173 Ill.Dec. at 609, 597 N.E.2d at 583; Matter of Juveniles, supra, 847 P.2d at 461.
We are not insensitive to the devastating impact a report of infection may have on the defendant and the prospect of social ostracism which may occur. However, the stigma a person faces is a function of the degree of dissemination. In this case, it is minimized by the confidentiality provisions of the statute. Defendants argue, however, that the victim is not precluded by statute from disseminating their HIV status. That is true, but fortunately or unfortunately, the same stigma which may attach to defendants would likely attach to the victim and her family if they were to divulge that she had been sexually assaulted by one or more HIV positive young men. Thus, the specter of broad dissemination of defendants' HIV status is substantially reduced.
The central focus of defendants' argument is that the tests are useless to the dominant intent of the legislation which is to provide information to advance the diagnosis and treatment of the victim. The trial judge accorded this argument and the testimony in its support conclusive weight. The trial court seems to have approached the analysis of the state's interest with a view that the testing scheme must be narrowly tailored to achieve the state interest and that the state's special need is dependent on the medical utility of the test. Neither Skinner nor Von Raab supports this proposition.
In Von Raab, the Commissioner of the United States Customs Service announced that all employees seeking employment, promotion or transfer to positions involved in drug interdiction or enforcement, to positions requiring the incumbent to carry a firearm, or to positions requiring use of classified information would be required to take drug tests. 489 U.S. at 660-61, 109 S.Ct. at 1388, 103 L.Ed.2d at 699. The Court held that the government interest in maintaining a drug-free workplace and work force was a special need that justified departure from the *590 ordinary warrant and probable cause, or any measure of individualized suspicion, requirement. Id. at 666, 109 S.Ct. at 1391, 103 L.Ed.2d at 702.
In Skinner, the drug tests had a direct impact on rail safety. 489 U.S. at 628-29, 109 S.Ct. at 1419-20, 103 L.Ed.2d at 667. A positive test can well determine the cause of an accident. Id. at 630, 109 S.Ct. at 1420, 103 L.Ed.2d at 668. Furthermore, the drug testing policy has an undeniably in terrorem effect. Id. at 629-30, 109 S.Ct. at 1420, 103 L.Ed.2d at 668. In Von Raab, however, the immediate benefits of the drug testing policy were more attenuated, since a positive test would not necessarily lead to the discovery of a corrupt agent, or even a potentially corrupt agent. Nevertheless, the Supreme Court did not question the utility of the means selected by the Customs Service to assure that agents "are physically fit, and have unimpeachable integrity and judgment." Von Raab, supra, 489 U.S. at 670, 109 S.Ct. at 1393, 103 L.Ed.2d at 705. Indeed, in response to petitioner's argument that the program was not a sufficiently productive mechanism to justify the intrusion on Fourth Amendment interests, the Court stated:
The mere circumstance that all but a few of the employees tested are entirely innocent of wrongdoing does not impugn the program's validity. The same is likely to be true of householders who are required to submit to suspicionless housing code inspections [citations omitted] and of motorists who are stopped at the checkpoints we approved in United States v. Martinez-Fuerte, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). The Service's program is designed to prevent the promotion of drug users to sensitive positions as much as it is designed to detect those employees who use drugs. Where, as here, the possible harm against which the Government seeks to guard is substantial, the need to prevent its occurrence furnishes an ample justification for reasonable searches calculated to advance the Government's goal.
[Id. at 674-75, 109 S.Ct. at 1395, 103 L.Ed.2d at 708.]
As further evidence that the utility of the search is not determinative of its reasonableness, the Court noted that when the government's interest lies in deterring highly hazardous conduct, a mandatory search policy of a large network population, such as all airline passengers and their luggage, which bears few positive results (weapons or explosive devices) does not impugn its validity. Id. at 675 n. 3, 109 S.Ct. at 1395 n. 3, 103 L.Ed.2d at 708 n. 3. *591 Rather, the lack of fruitfulness can logically be viewed as a hallmark of success. Ibid.; see also New Jersey v. TLO, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985)(conclusiveness of the means selected to advance the government interest is not necessary).
There are other reasons why we are reluctant to accord conclusory effect to the medical and psychological opinions presented at the evidentiary hearing. To be sure, each witness is an expert in the field. However, Dr. Oleske noted several times in his testimony that researchers and practitioners in the field of HIV testing and treatment are still unravelling the mysteries of the virus and its course. We note that the public is met frequently with announcements of breakthroughs in the diagnosis and treatment of those infected with the HIV virus and revisions in the Food and Drug Administration protocol to accelerate the availability of treatment modalities. Because the field is not static, a court should be very hesitant to rule that a legislative scheme of mandated testing is medically or psychologically useless to the victim or the treatment community.
Defendants' position concerning the utility of the test is not irrelevant, but we cannot grant to these "legislative" facts the same deference that is normally accorded to a trier of fact's resolution of a disputed question. Lockhart v. McCree, 476 U.S. 162, 168 n. 3, 106 S.Ct. 1758, 1772 n. 3, 90 L.Ed.2d 137, 145 n. 3 (1986); Matter of C.V.S. Pharmacy, supra, 116 N.J. at 497-98, 561 A.2d 1160; see also Adams, supra, 173 Ill.Dec. at 609, 597 N.E.2d at 583. The issue before us is not whether the State has chosen what all or even most experts would consider to be the best or most effective means of determining whether a victim has been infected by her assailant; rather, the inquiry is whether the means chosen can withstand constitutional scrutiny. Skinner, supra, 489 U.S. at 629 n. 9, 109 S.Ct. at 1419 n. 9, 103 L.Ed.2d at 667 n. 9; Von Raab, supra, 489 U.S. at 673-76, 109 S.Ct. at 1394-96, 103 L.Ed.2d at 707-09; Hutton Park Gardens, supra, 68 N.J. *592 at 563-64, 350 A.2d 1; see also Adams, supra, 173 Ill.Dec. at 610, 597 N.E.2d at 584.
When balanced, the individual defendant's interest in preventing a bodily intrusion and disclosure of his HIV status is significantly less weighty than the compelling state interest in the health and welfare of the victim in particular and the public in general. The testing, albeit not necessarily conclusive, will provide information to the victim of a sexual assault concerning the HIV status of his/her assailant at a point in time. Rightly or wrongly, the information may ease a victim's anxiety. The test results also serve the state's interest in safeguarding the health and safety of the offender and those with whom he/she comes in contact. These interests far outweigh the individual interests of the adjudicated juvenile or convicted adult sex offender. Accordingly, we declare N.J.S.A. 2A:4A-43.1 and N.J.S.A. 2C:43-2.2 constitutional and reverse and remand for the entry of an order requiring defendants to submit to the statutorily required tests.
Similarly, we do not find that the mandatory HIV blood test for adult and juvenile sex offenders violates our State Constitution. N.J. Const. art. I, ¶ 7. The "special needs" test has been noted with approval by our Supreme Court, although the Court has not been required to decide a case on that basis. See Rawlings v. Police Dep't of Jersey City, 133 N.J. 182, 190, 627 A.2d 602 (1993); O'Keefe v. Passaic Valley Water Comm'n, 132 N.J. 234, 242, 624 A.2d 578 (1993).
In Caldwell v. New Jersey Dep't of Corrections, 250 N.J. Super. 592, 595 A.2d 1118 (App.Div.), certif. denied, 127 N.J. 555, 606 A.2d 367 (1991), this court viewed "reasonable individualized suspicion" as the applicable standard in light of the fact that our constitution has been interpreted as affording greater protection from unreasonable searches than the federal Constitution. Id. at 609, 595 A.2d 1118. Caldwell is not dispositive of the issue in this case because the drug testing policy at issue required the commissioner to find a reasonable individualized suspicion. Ibid. Therefore, this court did not have to determine whether the "special *593 needs" test, which does not require the State to demonstrate a "reasonably individualized suspicion," is compatible with our state constitutional guarantees. Moreover, in Local 194A v. Burlington County Bridge Comm'n, 240 N.J. Super. 9, 572 A.2d 204 (App. Div.), certif. denied, 122 N.J. 183, 584 A.2d 244 (1990), this court held that mandatory drug testing of public employees involved in the opening and closing of the bridges spanning the Delaware River did not violate the Fourth Amendment. Significantly, this court utilized the "special needs" analysis and further found no reason to interpret the State Constitution as providing greater protection. Id. at 24-25, 572 A.2d 204.
Finally, defendants argue that N.J.S.A. 2A:4A-43.1 and N.J.S.A. 2C:43-2.2 violate the procedural due process guarantees of the federal and State Constitutions because a victim may request testing prior to conviction or an adjudication of delinquency. We need not reach this issue because each juvenile has been adjudicated delinquent.
Reversed and remanded.
NOTES
[1] This provision could be interpreted to require the juvenile to submit to subsequent testing after the latency period.
[2] 42 U.S.C.A. § 3756(f) requires withholding of ten percent of federal grants for victim support services unless the State has a law requiring AIDS testing upon the request of the victim.
[3] We have been informed that two Law Division judges in separate cases in different vicinages in unreported decisions have upheld the constitutionality of the statutes. See State v. Riley, Law Division (Somerset County) Indictment No. 96-02-0078-I and State v. Tobin, Law Division (Atlantic County) Indictment Nos. 95-04-0849-B and 95-05-1052-B. We cite these cases not as authority, R. 1:36-3, but simply to note that the subject has been addressed in other forums.