FLOYD WILLIAMS, ET AL., APPELLANTS, v. DEPARTMENT OF HUMAN SERVICES, RESPONDENT.

SAM JIMPERSON, ET AL., APPELLANTS, v. DEPARTMENT OF HUMAN SERVICES, RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued October 25, 1988—Decided November 15, 1988.

Before Judges PRESSLER, O'BRIEN and SCALERA.

*Shirley Brandman,* Assistant Deputy Public Advocate argued the cause on behalf of appellants in the first captioned matter (*Alfred A. Slocum,* Public Advocate, attorney, *Shirley Brandman, Richard E. Shapiro,* Director of the Division of Public Interest Advocacy and *David G. Sciarra,* Assistant Deputy Public Advocate, on the brief).

*Harris David* argued the cause on behalf of appellants in the second captioned matter (Legal Services of New Jersey by *David, Melville, D. Miller Jr., and Nancy Goldhill,* attorneys; Essex–Newark Legal Services by *Richard Foard,* attorney; Ocean–Monmouth Legal Services by *Connie Pascale,* attorney; Hunterdon County Legal Services by *Jane Herchenroder,* attorney; Middlesex County Legal Services by *Joyce Helfman,* attorney; *Harris David* on the brief).

*Thomas Fodice,* Corporation Counsel, attorney for City of Jersey City filed a letter brief as *amicus curiae.*

*Dennis J. Conklin,* Deputy Attorney General, argued the cause for respondent Department of Human Services (*W. Cary Edwards,* Attorney General, attorney, *William Harla,* Assistant Attorney General, of counsel, *Dennis J. Conklin,* on the brief).

The opinion of the court was delivered by

SCALERA, J.A.D.

This action involves the efforts of destitute, sick and disabled homeless citizens to compel the State, through the Department of Human Services (DHS), to grant them, in their plight, continued assistance in obtaining adequate shelter.

Appellants are all recipients of funds under the General Public Assistance Law, *N.J.S.A.* 44:8–107, *et seq.* (GA). The monthly grant under GA has been established by DHS as either $140 if the recipient is deemed employable, or $210 if deemed unemployable because of a physical or mental disability. *N.J.*

*A.C.* 10:85–4.1. Some recipients also qualify for a grant of food stamps. These amounts may vary, because the Legislature has dictated that "[t]he extent of individual grants shall be determined in accordance with the standards and budgets authorized by the Commissioner." *N.J.S.A.* 44:8–124(b); 44:8–114. In addition, so-called emergency grants or assistance (EA) have been made available to GA recipients to aid them if they lose their housing. *N.J.A.C.* 10:85–4.6. There is no dispute that the maximum entitlement to such EA is made up of a basic three month period plus a two month extension if an individual is unable to find suitable housing due to illness or incapacity. *N.J.A.C.* 10:85–4.6(b)(v).

The majority of appellants here receive the $210 maximum monthly grant under GA because they are in some way disabled. Their challenge on this appeal attacks the validity of *N.J.A.C.* 10:85–4.6(b) which terminates their EA benefits after a maximum of five months following which they must continue their day to day existence on the basis of their regular monthly GA grant. The appeals to this court emanate from DHS notices terminating their EA benefits because of the expiration of the five month period.[1]

The record in these cases is replete with evidence that appellants themselves and persons similarly situated are homeless adults who have lost their EA benefits, which had enabled them to live in various kinds of shelters, including motels or apartments, for the five month period provided for in the cited regulation. While the State denies that the problem is as widespread as claimed, there is no doubt that at least some of them are now living "on the streets" solely because of the loss of these EA benefits. They are unable to find suitable shelter which is affordable on the limited residual income of regular GA benefits.

---

[1]Although separate appeals have been filed by two different groups of appellants, their problems and issues coincide. We therefore elect to dispose of both appeals in this opinion and have consolidated them for that purpose.

For example, WB suffers from seizures and became homeless after he lost his job. As a result of the termination of his EA benefits he now sleeps with other homeless people on a concrete floor at the Path Station in Jersey City.

WD became homeless when his wife left him and he could no longer live in that apartment. Eventually he was laid off from his job and lived in a vacant garage. He suffers from severe epilepsy which causes him to black out and was able to reside at a motel only while he was receiving EA.

Jane Doe (a fictitious name) became homeless after she was evicted from her East Orange apartment due to overcrowding. She used to share this shelter with her aunt and 20 other people. She then lived in various shelters and motels through the utilization of EA funds. She now suffers from Acquired Immune Deficiency Syndrome, (AIDS).

> The AIDS makes me paralyzed. Sometimes for entire days, I can't walk, and sometimes the pain is so bad that I can't eat. I also suffer from heart troubles, gall stones, ulcers, high blood pressure, chest pains and breast discomfort. There are lumpy areas in my breast.

In spite of her illness, however, she has continued to look for suitable affordable housing but to no avail.

CR has been left homeless as a result of her financial destitution and is now "walking the streets at night and visiting with friends during the day."

Several of the appellants have unsuccessfully attempted to secure public housing shelter in larger cities like Newark and Jersey City. "In short, the record in this case describes a catalogue of human suffering, illness, disease, degradation, humiliation and despair which shakes the foundations of a common belief in a compassionate, moral, just and decent society." *Rodgers v. Gibson*, 218 *N.J.Super.* 452, 457 (App.Div. 1987).

In assessing the broad purposes of the GA Law, *N.J.S.A.* 44:8–107 *et seq.*, this court has taken note that it is basically a local government welfare program administered by the State which has been "designed to meet the legislatively recognized

moral imperative" and public policy that needy persons not "suffer unnecessarily from cold, hunger, sickness or be deprived of shelter." *Newark Div. of Public Welfare v. Ragin,* 197 *N.J.Super.* 225, 228 (App.Div.1984). Unlike the provisions of Aid to Families with Dependent Children (AFDC), *N.J.S.A.* 44:10–1 *et seq.,* for which federal matching funds are available, the GA program represents a purely State assumed responsibility for which no federal money is available to assist in underwriting the costs involved. *See Franklin v. N.J. Dept. of Human Services,* 111 *N.J.* 1, 7–10 (1988).

In furtherance of the powers granted to DHS for the administration of the GA program, its Commissioner has promulgated a detailed set of regulations. *N.J.A.C.* 10:85–1 *et seq.; Pascucci v. Vagott,* 71 *N.J.* 40, 49 (1976). As presently structured, those regulations provide EA benefits in addition to the regular monthly GA payment which must not exceed "the actual cost of adequate emergency shelter arrangements, at the most reasonable rate available." *N.J.A.C.* 10:85–4.6(b)(1). The regulations also understandably require that each EA recipient must continue to look for permanent housing in good faith during the time they are receiving such benefits. *N.J.A.C.* 10:85–4.6(b)(1)(ii).

The history of the Commissioner's attempt to compile these regulations has not been without controversy. As a matter of fact, in response to our decision in *Rodgers v. Gibson,* 218 *N.J.Super.* 452 (App.Div.1987), DHS conducted a public hearing on October 6, 1987. As a result the EA regulation was amended on January 4, 1988, simply extending the time period for GA recipients to receive EA from three months to five months. *N.J.A.C.* 10:85–4.6(a)(3)(i) and (b)(v).

Appellants' present attack on this new five-month regulation provision may be summarized as follows: As citizens in need of shelter, a right which they contend is guaranteed by our Constitution and ratified by the Legislature as a matter of public policy in the GA law, any regulation which acts to limit or deprive any needy homeless person of such basic shelter

requirements is invalid. The State first denies that there is any constitutional obligation requiring the public to provide shelter for indigent persons. Secondly, while admitting that the present program may fall short of providing shelter to meet the needs of all indigent persons, it simply points out that the funds legislatively appropriated for this purpose are finite and that the DHS is doing the best it can within the limited funds available.

It is well settled that administrative regulations cannot alter the terms of a legislative enactment or frustrate the policy embodied in the statute. *N.J. Chamber of Commerce v. N.J. Election Law Enforcement Comm.*, 82 *N.J.* 57, 82 (1980); *Abelson's Inc., v. N.J. State Board of Optometrists*, 5 *N.J.* 412, 423–24 (1950). Further, administrative agencies charged with implementing a particular statute must do so in a manner that effectuates the intention of the Legislature. *Haddock v. Passaic Dept. of Community Dev.*, 217 *N.J.Super.* 592, 596–97 (App.Div.) certif. den. 108 *N.J.* 645 (1987); *Fiola v. N.J. Treasury Dept.*, 193 *N.J.Super.* 340, 347 (App.Div.1984). Thus, "a regulation will fall if [the] court finds that the rule is inconsistent with the statute it purports to interpret." *See, e.g., Smith v. Director Div. of Taxation*, 108 *N.J.* 19, 26 (1987) and cases cited therein; *see also Service Armament Co. v. Hyland*, 70 *N.J.* 550, 562 (1976).

More to the point, our courts have previously addressed the very dichotomy which is presented here—can the judicial branch of government exercise its authority to mitigate such human suffering without ordering a massive commitment of public funding thereby intruding upon an obligation which primarily belongs to other branches of government under our Constitution?

In *Maticka v. City of Atlantic City*, 216 *N.J.Super.* 434 (App.Div.1987), there was an analogous attack on the DHS regulations governing the AFDC program. There we concluded that the particular regulation seeking to bar such benefit

under a "so-called fault standard" was arbitrary, capricious and unreasonable because it was patently contrary to the stated statutory policy, purpose and provisions of the AFDC law. However, we specifically and dutifully recognized that within the parameters of that law, it was the right of the executive branch of government (DHS) to otherwise determine the details of how the program should be administered.

In *Rodgers v. Gibson,* 218 *N.J.Super.* 452 (App.Div.1987) the same fault standard, but as applied to the GA law, was struck down for the same reason as articulated in *Maticka.* Again we reiterated our determination not to otherwise invade the right reserved to other branches of government which might be viewed as making policy determinations in this troublesome area of aid to the homeless.

Recently in *Franklin v. N.J. Dept. of Human Services,* 111 *N.J.* 1 (1988) our Supreme Court was faced with a challenge to an identical DHS regulation providing for a five-month period of EA benefits under the AFDC program. The Court recognized the extent of the human suffering documented in the record and of the charge there that the State had failed to cope with a growing problem. It acknowledged that limited State resources only served to defeat achievement of the humane goals of providing continued assistance to all needy persons under the federally subsidized AFDC program. However, it opted to exercise judicial restraint in that case based on the representations made to it by the State that new programs were in place which were designed to meet the needs of homeless persons in the AFDC program. It therefore stayed its hand and declined to invalidate the whole DHS administrative scheme before those programs "had a chance to be tested." *Franklin,* 111 *N.J.* at 18. However, the Court did not thereby wash its hands of the problem but cautioned that, "[s]hould the problem of homelessness of children [under AFDC] not prove amenable to solution by those alternatives" it would undertake to decide whether the DHS regulations, as promulgated, "meet

the declared legislative purpose" and further, "whether any constitutional rights have been violated." *Ibid.*

This case is markedly different from that presented in *Franklin* in at least one important respect. Here the State acquiesces in the charge that despite its best efforts to motivate the involvement of local governmental and private agencies, it has been unsuccessful in meeting the basic shelter needs of GA recipients for a myriad of reasons. *See generally, Institute of Medicine, Homelessness, Health and Human Needs,* (1988), in which the problems of the homeless in this country are painfully spelled out.[2] Certain of our local governments apparently have tried to provide additional facilities to serve the needs of the homeless within their boundaries notwithstanding the refusal of any further direct financial aid to appellants from DHS but even these efforts have fallen short of providing the needed assistance. As a result, the State has shrugged its fiscal shoulders in a gesture of frustration born of the inadequate funding problem.

In light of our acknowledged limited role in these areas, as noted in *Franklin, Maticka* and *Rodgers,* our mission here is reduced to a relatively simple legal inquiry: Is a regulation which terminates EA benefits after expiration of a five-month period, without any other shelter assistance provided, so patently contrary to the expressed policy and purpose of the GA law, that it cannot stand? In this regard we are not concerned with the adequacy of any specific procedure to determine eligibility for such aid but only whether, broadly speaking, the whole regulatory scheme being used to accomplish the statutory goals is properly constructed.

*N.J.S.A.* 44:8–109 of the GA law, entitled "Public policy regarding assistance to needy persons," clearly sets forth that,

---

[2]We also note that our Commissioner of the DHS is an active contributing member of the Committee charged with the responsibility of issuing this report on behalf of the Institute.

> It is hereby declared to be the public policy of this State that every needy person shall, while in this State, be entitled to receive such public assistance as may be appropriate with reference to need of a category of persons and whether or not such persons are employable, ... [and] that all needy persons not otherwise provided for under the laws of this State shall hereafter receive public assistance pursuant to law and the provisions of this act.

The law then establishes a mechanism whereby such public assistance actually is to be provided by municipalities and counties pursuant to guidelines established by the DHS. To that end DHS is required to reimburse 75% of such aid to local authorities. More basically, the act defines the assistance to be afforded as follows:

> The director of welfare, by a written order, shall render such aid and material assistance as he may in his discretion, after reasonable inquiry, deem necessary to the end that such person may not suffer unnecessarily, from cold, hunger, sickness, or be deprived of shelter pending further consideration of the case. [*N.J.S.A.* 44:8-122].

Generally speaking, assistance in the GA program now takes three distinct forms. One, "immediate assistance," which provides interim relief pending a full investigation concerning eligibility. Two, "continuing assistance," which are benefits granted on an ongoing basis. Both are derived from the express provisions of the law. Thirdly, there is the emergency grant or EA which is the focus of appellants' challenge here. The EA benefit was created by the Commissioner himself through the adoption of the cited regulation and represents his attempt to further discharge the broad public policy statements cited in the governing law.

The DHS points out that the EA program is only extant because the Commissioner has carved it out of the funds available. This is hardly relevant since the Legislature has mandated that aid is to be provided in whatever form is necessary to accomplish its goal. Indeed, a failure to have done so might have resulted in a condemnation of its entire program on that basis.

Appellants argue that DHS is violating that statutory policy by arbitrarily terminating such "emergency" shelter benefits after a five-month period without regard to individual need.

The State insists that to do otherwise would convert the temporary assistance program thus created into "an unending and costly obligation" which the courts lack the authority to accomplish.

It is true that the judiciary may not intrude itself into areas reserved to other branches of government. *Franklin,* 111 *N.J.* at 16. However, we are obligated at least to review the the regulations pursuant to which DHS is undertaking to disburse what funds are appropriated for the stated statutory purposes to determine whether or not they "plainly" conflict with the legislative goals of the underlying law. 111 *N.J.* at 17.

That circumscribed inquiry leads us to the conclusion that the scheme of the DHS regulations, including that relating to EA, plainly is inconsistent with such goals. Thus, we feel constrained to declare that, to the extent that such regulations terminate such benefits based solely upon expiration of a prescribed period without additional support to meet the further needs of individual recipients, they cannot stand. *Cf. Franklin,* 111 *N.J.* at 9, 20. In 'doing so we confess our keen awareness of the frustration which the Commissioner must obviously be experiencing by reason of the limitation of funds. However, terminating all shelter benefits in such a manner necessarily assumes that the needy's homelessness problem will be resolved within that time which has proven to be untrue. The result is that the bridge of aid to the homeless directed to be constructed by the Legislature does come to an "end in the middle of the void," a result which we have already condemned as invalid in *Maticka,* 216 *N.J.Super.* at 453.

As this court pointed out in *Franklin,*

> If the appropriations for the [legislatively approved] program are insufficient to satisfy all the vital needs of recipients the Department [of Human Services] still must adopt a structure of benefits which can be provided within those appropriations. [225 *N.J.Super.* 504, 514 (App.Div.), aff'd 111 *N.J.* 1 (1988)].

A reading of the entire GA law inescapably leads one to the conclusion that it mandates *continuing* assistance to needy persons as long as that need exists, albeit within the restraints

of the fiscal appropriations allocated. *N.J.S.A.* 44:8–120, 122, 124, 127.[3]

In this regard then, it may well be necessary for DHS to restructure its entire regulatory scheme so that the limited funds appropriated may be more equitably disbursed. Thus, while a flat regular monthly allowance, together with supplementary benefits such as food stamps, may be adequate to meet the shelter needs of some recipients, the unavailability of low cost housing and shelters in some areas may render such a flat allowance approach to be unrealistic with respect to others. We suggest that a regulatory program based on an assessment of *individual* needs and a concomitant recognition of geographical and demographical differences may be more appropriate. *Franklin,* 111 *N.J.* at 9, 20. There is sufficient flexibility built into the GA law to allow the State to reimburse local governments which render "public assistance" in a manner other than direct monetary payment[4] to those eligible. *E.g. N.J.S.A.* 44:8–108; 44:8–128(b) and (c).

There is little doubt in our minds that the DHS has striven to resolve the mounting problem of the homeless within its limited resources. That other resources must be garnered to ultimately resolve this problem has been well documented. *Homelessness, Health and Human Needs, supra,* at 136–61. That leaves DHS with the unenviable task of trying to stem the flow of the growing number of homeless through application of its limited funds until help comes from those other sources. Until

---

[3]Perhaps the problem is the provision of such assistance under the rubric of "emergency assistance." While such a category may be appropriate, what we perceive in these appellants is a continuing need. Nonetheless, even if the need is born of an emergency which does not cease within the prescribed time limit, it is still a need that must be met by DHS.

[4]Obviously there is no need to resort to use of the "welfare-motel" type of shelter since federal subsidies for such use are not available as with the AFDC cases. Additionally, we would point out that "shelters" which accept occupants only at night as a place to sleep and bar admission during the day is hardly an acceptable permanent solution.

then, however, DHS cannot discharge its responsibility through regulations which act simply to expend the appropriated funds in a manner which ignores the individual needs of these poverty-stricken human beings. We cannot and do not venture to detail precisely what is the best course for DHS to follow because we defer to the principle that such decisions are best left to the expertise of the administrative agency charged with that obligation. *Franklin*, 111 *N.J.* at 17; *Maticka*, 216 *N.J. Super.* at 456; *Rodgers*, 218 *N.J.Super.* at 458. *See also Texter v. Human Services Dept.*, 88 *N.J.* 376, 383–387 (1982).

What we are saying is simply that which we have already expressed in *Maticka* and *Rodgers* and for the very same reasons. Terminating shelter benefits without some other residual resource available to help individuals who continue to need shelter is so inconsistent with the stated purpose of the GA law as to amount to an arbitrary, capricious and unreasonable method of dealing with the problem. We are confident that the DHS can and will find another way to handle this perplexing moral dilemma to the end that the truly needy homeless will always have somewhere to turn for help in this State. A progressive compassionate society should not be willing to settle for less since it has established a law that requires that "all needy persons shall, while in this State, be entitled to receive such public assistance as may be appropriate."

It may well be that some EA recipients are not really entitled to the benefits of any such program but that is a problem of enforcement. The effort to cull out such persons cannot result in a callous ouster of the truly needy from those shelter benefits. Lastly, we note that we have been advised of no comprehensive and long term plan to provide aid to local governments and private agencies which would assist in solving the problems of the long term homeless. *Cf. Franklin*, 111 *N.J.* at 15–16. While DHS does seek to identify programs which purport to be available to meet those needs, we question their effectiveness, if not their very availability.

Thus, without vindicating such need as a constitutional right, as appellants' urge, we invalidate the DHS regulatory scheme insofar as it terminates financial shelter assistance after a specified period without any provision for some additional ongoing assistance to insure, as best can be provided, that needy persons who continue to be without shelter can continue to be helped in some way and we remand and direct DHS to design new regulations consistent with our observations in this opinion.