FLOYD WILLIAMS, BUELAH DAVIS, CATHERINE DAWSON, JANE DOE, ELLA HARRIS, RODNEY MAYES, WALTER BUGG, JOHN DOE, LESTER ELLINGTON, GEORGE GENDER, HECTOR GONZALEZ, DONALD LEE JENKINS, MIRIAM JONES, CHERYL RANKINS, ANDRE STEPHENS, AND ANGELA WILLIS, RESPONDENTS, v. DEPARTMENT OF HUMAN SERVICES, APPELLANT.

SAM JIMPERSON, ALLEN STINSON, ROSE MARY EVANS, WILLIAM DIMICK, ANN TATE, VERONICA COLLIER, LUCILLE COLONTONE, LOUIS ANTONIO, KENNETH BURRUS, FLOYD YANCEY, JACK MCCLELLAN, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, RESPONDENTS, v. NEW JERSEY DEPARTMENT OF HUMAN SERVICES, APPELLANT.

Argued May 9, 1989—Decided August 1, 1989.

*Dennis J. Conklin,* Deputy Attorney General, argued the cause for appellant (*Peter N. Perretti, Jr.,* Attorney General of New Jersey, attorney, *William Harla,* Assistant Attorney General, of counsel).

*Shirley Brandman,* Assistant Deputy Public Advocate, argued the cause for respondents Floyd Williams, et al. (*Alfred A. Slocum,* Public Advocate, attorney).

*Joseph Harris David* argued the cause for respondents Sam Jimperson, et al. (*Melville D. Miller, Jr.,* President, Legal Services of New Jersey, Inc., attorney).

The opinion of the Court was delivered by

O'HERN, J.

This case, like *Franklin v. New Jersey Department of Human Services,* 111 *N.J.* 1 (1988), concerns the validity of a regulation of the defendant agency that sets a five-month expiration period for a certain form of emergency assistance

for public assistance recipients threatened with homelessness. The Appellate Division aptly described the action as involving "the efforts of destitute, sick and disabled homeless citizens to compel the State, through the Department of Human Services (DHS), to grant them, in their plight, continued assistance in obtaining adequate shelter." 228 *N.J.Super.* 529, 530 (1988).

Our Court has previously addressed State-funded assistance to the homeless in *Franklin v. New Jersey Department of Human Services, supra,* 111 *N.J.* 1 which dealt with an Emergency Assistance (EA) program set up under the program of Aid to Families with Dependent Children (AFDC). The form of benefits before us is an EA program set up under the State's General Public Assistance Law (GA), *N.J.S.A.* 44:8–107 to 44:8–157. The programmatic difference is that the AFDC program serves only families with children in need, while the GA program, at least in part, serves "the familiar single urban dwellers who seek shelter in bus or train stations when the street is inhospitable." *Franklin, supra,* 111 *N.J.* at 4.[1] Legal Services of New Jersey characterizes its clients thus:

> GA recipients are not families. They do not have the sympathetic appeal of children, and do not receive the same attention from the other branches of government and the media. Indeed they are almost the forgotten homeless. Yet they are elderly, sick, disabled, needy, down and out. They need declaratory relief from this court to declare their rights, and to bring the necessity of a resolution of their plight to the forefront. If this branch of government does not react, petitioner's plight will go ignored; their rights will be lost.

The Appellate Division described their plight at the time of its decision. The majority of the claimants received the $210 maximum monthly grant under GA. With urban rents at usually double their monthly allowance, their lack of shelter is understandable. The EA program provides temporary benefits

---

[1]There is a difference in funding philosophies that will be discussed in somewhat greater detail. The AFDC program is a joint federal and state program involving 50% of federal money and 50% non-federal money, consisting in New Jersey of 35% State money and 15% county money. 42 *U.S.C.* 601, 603(a)(5). The GA program is funded entirely through non-federal sources and currently is funded 75% State and 25% municipal. *N.J.S.A.* 44:8–110, 44:8–129.

in addition to the monthly GA grant to meet emergent shelter needs. At least some of the claimants, at the time of the Appellate Division disposition, were "living 'on the streets' solely because of the loss of these EA benefits." 228 *N.J.Super.* at 531.

> For example, WB suffers from seizures and became homeless after he lost his job. As a result of the termination of his EA benefits he now sleeps with other homeless people on a concrete floor at the Path Station in Jersey City.
>
> WD became homeless when his wife left him and he could no longer live in that apartment. Eventually he was laid off from his job and lived in a vacant garage. He suffers from severe epilepsy which causes him to black out and was able to reside at a motel only while he was receiving EA.
>
> Jane Doe (a fictitious name) became homeless after she was evicted from her East Orange apartment due to overcrowding. She used to share this shelter with her aunt and 20 other people. She then lived in various shelters and motels through the utilization of EA funds. She now suffers from Acquired Immune Deficiency Syndrome, (AIDS).
>
> > The AIDS makes me paralyzed. Sometimes for entire days, I can't walk, and sometimes the pain is so bad that I can't eat. I also suffer from heart troubles, gall stones, ulcers, high blood pressure, chest pains and breast discomfort. There are lumpy areas in my breast.
>
> In spite of her illness, however, she has continued to look for suitable affordable housing but to no avail.
>
> CR has been left homeless as a result of her financial destitution and is now "walking the streets at night and visiting with friends during the day." [*Id.* at 532.]

The Appellate Division concluded: "In short, the record in this case describes a catalog of human suffering, illness, disease, degradation, humiliation and despair which shakes the foundations of a common belief in a compassionate, moral, just and decent society." *Ibid.* (quoting *Rodgers v. Gibson*, 218 *N.J.Super.* 452, 457 (App.Div.1987)).

The EA program had provided their only surcease from such misery. Under the GA/EA program, DHS was paying motels and hotels directly to shelter these individuals. All agree that the welfare hotel is not the answer. DHS Commissioner Altman has been resolute in his determination to end such wasteful payments to welfare hotels and to encourage other suitable housing accommodations. That takes time, and until that time, the question, as in *Franklin*, is not whether 150 days is a

reasonable expiration date for the EA benefits, but rather whether the Legislature intends that there shall be no other program in place to address the GA recipients' need when the EA benefits run out. In analyzing that question, we must do more than look at this one EA regulation in isolation; we must view the regulation, as we believe the Appellate Division did, in the context of the overall statutory scheme of New Jersey public assistance to provide relief for the homeless.

I

Before addressing the particulars of the case, we shall address the threshold argument asserted by DHS that the judiciary should play no role in addressing the needs of the homeless under this regulatory arrangement. The agency claims that

the Appellate Division, in a significant extension of its authority, has impermissibly intruded into the constitutionally and legislatively delegated affairs of the Executive branch. Pulling free of the traditional restraints enjoining the courts of this State from disturbing the reasoned choices made by executive agencies in the performance of their duties, the court below imposed its own choices by invalidating a rational and vital regulatory scheme of the Commissioner of Human Services and virtually directing him to restructure a State welfare program.

We respect that courts have but a limited role to play in reviewing the actions of other branches of government. In reviewing agency action, the fundamental consideration is that a court may not substitute its judgment for the expertise of an agency "so long as that action is statutorily authorized and not otherwise defective because arbitrary or unreasonable." *Dougherty v. Department of Human Servs.*, 91 *N.J.* 1, 12 (1982).

In *Pascucci v. Vagott*, 71 *N.J.* 40 (1976), then-Chief Justice Hughes faced the almost identical argument in the context of the validity of a regulation that distinguished between "employable" and "unemployable" needy. The State argued that on the basis of the powers delegated by statute to the Commissioner, the State "would justify the challenged regulation, emphasizing

its need in respect of the finite nature of welfare resources available * * *." *Id.* at 49. Although the Court recognized that there is indeed a broad grant of authority implicit in such a statutory framework, it nonetheless concluded that a conflict between the legislative standards of the act and the agency's regulation would justify judicial intervention. *See id.* at 50.

Moreover, that Court pointed out that prior to the Constitution of 1947, "persons aggrieved by action or inaction of state or local administrative agencies could seek review by applying for one of the prerogative writs." *Id.* at 51. Those writs granted to every citizen the right to test in a court whether a government agency has or has not acted in accordance with law. *See id.* at 52. These writs were superseded in our Constitution of 1947, which provided that "in lieu thereof, review was to be had in the Superior Court ' * * * on terms and in the manner provided by the rules of the Supreme Court * * *.' " *Ibid.* (quoting *N.J. Const.* of 1947, art. VI, § 5, para. 4).

 Courts then can act only in those rare circumstances when it is clear that the agency action is inconsistent with its legislative mandate. In light of "the executive function of administrative agencies, * * * the judicial capacity to review administrative actions is limited." *Gloucester County Welfare Bd. v. State of N.J. Civil Serv. Comm'n,* 93 *N.J.* 384, 390 (1983). Though sometimes phrased in terms of a search for "arbitrary, capricious or unreasonable" action, *Campbell v. Department of Civil Serv.,* 39 *N.J.* 556, 562 (1963), the judicial role is restricted to three inquiries: (1) whether the agency's action violated the enabling act's express or implied legislative policies, (2) whether there was insubstantial evidence in the record to support the findings on which the agency based its actions, and (3) whether in applying the legislative policies to the facts, the agency clearly erred by reaching a conclusion that could not reasonably have been made after weighing the relative factors.

We address in this case only the first of those inquiries, *i.e.,* whether the action violates the enabling act's express or implied legislative policies. We realize that we cannot administer a vast social-service agency, nor, indeed, tell it how to do its job. Our only mission is to examine the legislative delegation of statutory responsibility and measure whether the agency has acted in accordance with that mandate.

## II

Before attempting to answer that question, some general background with respect to the program is in order.

Relief of the poor has been considered an obligation of government since the organization of our State. Such relief has been regarded as a direct charge on the body politic for its own preservation and protection, standing very much in the same position as the preservation of law and order. * * * Before statehood was achieved, the Legislature of the colony adopted measures for relief of the poor. [*Roe v. Kervick,* 42 *N.J.* 191, 212–13 (1964).]

Those ancient laws reflected the "mores of the times." *See id.* at 213. Today's laws reflect today's mores. We may draw again on the Court's opinion in *Pascucci v. Vagott, supra,* which describes the nature of the GA program in 1976. That program is the lineal descendant of our pre-colonial laws, and is the program of "last resort" for many needy citizens.

General assistance, which is sometimes referred to as "municipal welfare," is a state-supervised, municipally administered public assistance program available to needy persons not otherwise provided for under state laws, that is to say persons not qualifying for "categorical" welfare aid such as old age assistance, aid to the blind, disability assistance, aid to families with dependent children or aid to families of the working poor.

General assistance is considered a "residual" or last resort program under which aid is given to needy single persons and married couples between 18 and 65 years of age who have no minor children. Under the statute cited, the State regulates the program for approximately 400 municipalities which accept state financial assistance.

Before 1971 general assistance grants were based on the extent of need as calculated for individual cases. A budget was prepared to correlate an applicant's actual costs, for shelter, clothing, personal and household needs and scheduled sums for food, to his income and resources. In 1971, however, all state welfare programs including categorical assistance and general assistance eliminated such individualized computations and instituted a "flat grant" system. [71 *N.J.* at 44–45 (citation omitted).]

As of 1988, there were approximately 20,000 general assistance recipients covered by the program. As we adverted to in *Franklin, supra,* 111 *N.J.* at 9, it is this replacement of the individualized assistance grant with the "flat grant" system that is one of the obvious causes of the homeless problem. We say this without criticism of the system, only to note that what in 1971 seemed to be a good idea may not be working out too well. The objection in 1971 was that flat grants would drive the clients into cheap slum housing, thus perpetuating the existence of slum-housing conditions. There is no such thing as cheap housing today. The words of DHS Commissioner Altman, in his report to the Legislature on the AFDC program, are apt here:

> A shortage of affordable housing has created a crisis for many New Jerseyans. This housing shortage, fueled by skyrocketing housing costs, gentrification, and increased commercial and residential development in urban centers, has made it increasingly difficult for low-income families to remain adequately housed. Increased home sharing with relatives and friends and movement to smaller and more distant living quarters are the primary means of accommodation among low-income individuals and families in the face of an increasingly unfavorable housing market.
>
> It is this structural problem of too little affordable housing that gives rise to most homelessness and that creates the need for emergency assistance in the state's AFDC program.
>
> Any attempt to alleviate homelessness short of systemic efforts to expand the supply of affordable housing—an expensive and difficult effort at best—will fall short. In the absence of an increased housing supply, our programs, including emergency assistance, must be marginal solutions that mitigate, but do not eliminate, the problems of homelessness. To expect more from the tools at hand, including emergency assistance, is unrealistic and to attempt to turn these limited tools into broad solutions is impossible. [D. Altman, Commissioner of Department of Human Services, Report to the Legislature 2 (Mar. 10, 1988) (hereinafter Report to the Legislature).]

Assistance granted through the GA program, as defined by the statute and the regulations promulgated thereunder, *N.J.A.C.* 10:85–1.1 to –11.2, takes three distinct forms. Two of these, immediate assistance and continuing assistance, are derived from the express terms of the Act. *N.J.S.A.* 44:8–120, 44:8–124. The third, emergency assistance, with which we deal, was created by regulation. *N.J.A.C.* 10:85–4.6.

"Immediate public assistance" is that which is granted to an apparently qualified applicant as interim relief pending full investigation of eligibility. *N.J.S.A.* 44:8–120 to 44:8–123. The only purpose of these provisions is to ensure that a facially-qualified applicant receive some aid immediately, rather than be deprived unnecessarily of needed assistance while an individual's qualifications for GA are being fully investigated.

The second form of assistance provided for in the Act is "continued assistance," that is, assistance that is granted on an ongoing basis once the agency's investigation of eligibility has been completed. *N.J.S.A.* 44:8–124. Regulations of the Commissioner provide for cash assistance of uniform amounts based on the schedule published at *N.J.A.C.* 10:85–9.4. This assistance continues for as long as the recipient remains qualified. Normally, an individual remains qualified so long as he or she is financially in need. There is one notable exception: pursuant to *N.J.S.A.* 44:8–114 a recipient who fails or refuses, "without good cause," to comply with certain statutory work requirements "shall thereupon become ineligible for public assistance for a period of 90 days" irrespective of financial or other need.

We are concerned with the third type of assistance provided under the EA program, which is an add-on to the basic flat-grant system. Like the AFDC emergency-benefits program, the GA program provides temporary supplementary benefits to meet emergent housing needs. The GA emergency grant regulation, *N.J.A.C.* 10:85–4.6, is nearly identical to its AFDC counterpart considered in *Franklin.* We draw on DHS's brief to describe the regulation. Under that regulation, an individual who is otherwise entitled to receive GA can receive EA temporarily. An EA recipient is furnished assistance in addition to the regular monthly grant to pay the *full cost* of temporary shelter whether the recipient is about to lose or has lost housing for any of the reasons specified in the regulation as an "emergency." *N.J.A.C.* 10:85–4.6(a).

Moreover, like the AFDC/EA regulation, the GA/EA regulation was substantially amended after lengthy rule-making proceedings that were undertaken in response to *Rodgers v. Gibson, supra,* 218 *N.J.Super.* 452. In *Rodgers* the Appellate Division invalidated DHS's interpretation of the so-called "fault" limitation on eligibility, and remanded the matter to DHS with the instruction that it conduct rule-making proceedings concerning the program's "time" limitation. *Id.* at 458–61. Consequently, the regulation's eligibility requirements, the scope of benefits, and period of time for assistance were greatly liberalized.

In its current form the regulation expands the eligibility criteria, thus expanding the number of potential recipients. Also liberalized was the scope of benefits available as emergency assistance. New to the GA program are grants to cover delinquent rent or mortgage payments in order to prevent homelessness in the first instance, and grants to pay expenses necessary to the establishment of a new home, such as advance rent, utility deposits, furniture storage, moving expenses, and purchase of furniture and appliances. The critical feature in this appeal is a time limitation set for emergency assistance, normally ninety days, *N.J.A.C.* 10:85–4.6(b), but with extensions of up to two additional months. *N.J.A.C.* 10:85–4.6(b)1(v). Thus effectively, like the AFDC/EA program, emergency assistance may be provided for up to five months.

What drives this case, as it did the AFDC regulation in *Franklin,* is the anomaly of the open-ended nature of the EA program. Whereas the GA beneficiaries receive flat grants of $140 if they are each deemed employable or $210 if deemed unemployable, EA is open-ended. It pays whatever the hotel/motel requires. *See N.J.A.C.* 10:85–4.6. Critically, from the viewpoint of a program with split administration, there may be no matching share required from the municipality for emergency assistance. In contrast, a 25% contribution is required from the municipalities for the flat grants. The Governor's FY 1989–90 budget states that costs for GA/EA recipients are

shared by 75% State and 25% *county;* we are uncertain of this and express no opinion on this formula. Gov. Thomas H. Kean, *New Jersey Fiscal Year 1989–1990 Budget: Budget Message and Taxpayers' Guide* 107 (1989) (Detail of Appropriations).

It was against this background that the Department countered the attack on the durational restriction by arguing, first, that the GA law did not require the Department to provide the program at all; second, that "the expanded 5–month limitation on emergency assistance is a rational exercise of the Commissioner's discretionary authority to allocate limited State funds appropriated for general assistance"; and third, that "the New Jersey Constitution did not provide a right to emergency shelter beyond that provided by *N.J.A.C.* 10:85–4.6." (The decision below did not address any constitutional arguments, and therefore neither do we, limiting ourselves to the first two points presented to the Appellate Division.)

The Department's argument was that "[t]he plain wording of the Act creates neither an obligation to provide nor an entitlement to receive any aid beyond immediate initial assistance and the 'continued assistance' which is provided through the recurring monthly 'flat grant' provided by regulation." Hence, the Department's election to provide more than what is minimally required could create no entitlement that such add-on grants be continued. Secondarily, the Department argued that since "the creation of emergency assistance was a discretionary act to begin with, any limitation on such assistance rationally serving a legitimate governmental interest would easily pass muster under the standards of review traditionally employed. *See, e.g., Barone v. Dept. of Human Services,* 107 *N.J.* 355 (1987)." Under that argument, its "choice of a five-month limitation on homeless aid, given the limits on State funding, is clearly a rational one."

But as we noted in *Franklin,* the question is not whether a five-month period for the expiration of EA benefits is valid. The question is "whether it is legal to terminate the emergency

aid to the homeless * * * after five months" if there are no programs "in place to make reasonably certain that the [individuals] previously housed in motels will find shelter and eventually housing elsewhere." 111 *N.J.* at 20.

As currently administered, the EA program may be self-defeating. Costs for sheltering one individual in a privately-owned motel can reach as high as $2,000 per month for inadequate accommodations. It consumes too much of the Department's money, which might be devoted to more fundamental solutions to these individuals' problems. Focusing on EA diverts attention from the underlying question, that is, the agency's administration of its statutory charge to furnish "a 'residual' or last resort program" for the needy. *Pascucci, supra,* 71 *N.J.* at 45. While the municipalities are the front-line for delivery of this program, the "power for guiding the administration of the assistance programs is delegated to the Commissioner." *Id.* at 48.

 The Department argues that it has no mandate to provide shelter for the needy. It points out that the language in *N.J.S.A.* 44:8–122 that local grants be fashioned "to the end that such person may not suffer unnecessarily, from cold, hunger, sickness, or be deprived of shelter pending further consideration of the case" applies only to the interim orders of "temporary assistance." Does it follow from this that the Legislature intended that such persons should be caused to suffer unnecessarily from cold or be deprived of shelter *after* their cases were investigated? That would make no sense of the statute. Rather, the "continuing assistance" provisions of the act state that assistance "may be provided" in the form of "cash assistance" or any other authorized method as "may be necessary to protect the well-being of[ ] the person or persons to whom assistance is to be granted such as the provision of food, milk, *shelter,* fuel, clothing or medical care * * *." *N.J. S.A.* 44:8–124 (emphasis added.) Yes, the extent of individual grants shall be determined in "accordance with the standards

and budgets authorized by the commissioner," *N.J.S.A.* 44:8–124, but we may safely assume that the Legislature did not intend those standards to bring about the very suffering that the Act was intended to remedy, namely, the loss of shelter. Although the language of the act has changed over the years and the charge appears explicitly in the "temporary assistance" rubric, we are satisfied, as was the *Pascucci* Court, that "[t]he law exists 'to the end that * * * person[s] may not suffer unnecessarily, from cold, hunger, sickness, or be deprived of shelter * * *'." 71 *N.J.* at 48 (quoting *N.J.S.A.* 44:8–122).

It was this plain legislative purpose that led the Appellate Division to conclude that

[a] reading of the entire GA law inescapably leads one to the conclusion that it mandates *continuing* assistance to needy persons as long as that need exists, albeit within the restraints of the fiscal appropriations allocated. *N.J.S.A.* 44:8–120, 122, 124, 127. [228 *N.J.Super.* at 538–39 (footnote omitted).]

The panel explained:

[w]hat we are saying is simply that which we have already expressed in *Maticka* and *Rodgers* and for the very same reasons. Terminating shelter benefits without some other residual resource available to help individuals who continue to need shelter is so inconsistent with the stated purpose of the GA law as to amount to an arbitrary, capricious and unreasonable method of dealing with the problem. [*Id.* at 540.]

Finally, and most significantly for our purposes, the Appellate Division said:

[W]e note that we have been advised of no comprehensive and long term plan to provide aid to local governments and private agencies which would assist in solving the problems of the long term homeless. *Cf. Franklin*, 111 *N.J.* at 15–16. [*Ibid.*]

Indeed, as the Public Advocate argued, although DHS initially had responded to the post-AFDC/EA shelter needs of homeless *families*, the agency had virtually "abandoned" these needy men and women. DHS failed to provide a "package of initiatives to assist [municipalities] in placing [individuals] who are temporarily housed in welfare motels." *Franklin, supra,* 111 *N.J.* at 13. Despite allocating one million dollars in funds to the County Homelessness Grant program to aid families, DHS has not furnished GA recipients with an analogous grant.

While DHS paid a finders fee to non-profit organizations that locate housing for AFDC families, DHS did not provide the GA recipients with a similar service. Although converting State facilities into transitional housing for homeless families, DHS' made available no such shelters to GA recipients to prevent their homelessness. In short, it appeared from the record that there were simply no other shelter resources available for the EA recipients.

The Appellate Division thus found no safety net such as we had found in *Franklin* that would "make reasonably certain that the [individuals] previously housed in motels will find shelter and eventually housing elsewhere." 111 *N.J.* at 20. Accordingly, the Appellate Division invalidated the regulation and remitted the matter to the agency to develop a program consistent with its statutory mandate. We granted DHS's petition for certification to review that judgment. 114 *N.J.* 514 (1989).

### III

Before us the case has taken on a new dimension. After the Appellate Division had reached its decision, DHS's Director of the Division of Public Welfare outlined, in a February 14, 1989, memorandum, recommended measures to enhance post-EA shelter availability among the GA population if the five-month limitation were reinstated. Because these proposals entail the expenditure of funds, implementation of the proposals was deferred pending the resolution of the issue of the time-limitation's validity.

At the outset, DHS noted the existence of a "fully operational program of emergency shelter services" with approximately 1,540 shelter beds. Of these, DHS said eighty were vacant on November 28, 1988, with only thirty-seven GA recipients in the system who had exhausted their five-month benefit. But the homeless advocates ask how a recipient is to get to a shelter in another part of the state, and whether this is the answer for

the chronically ill, to be moved in and out of an overnight congregate shelter.

Next, DHS noted the existence of the Comprehensive Emergency Assistance System (CEAS), *L.* 1988, *c.* 30, which it describes as "the primary vehicle for comprehensive, long-term homeless services planning throughout the State." But again, one must ask, what exactly does this mean to the homeless? Do they go to a CEAS office and present themselves in need of housing? We gather not. An affidavit on file indicated that of a $1.2 million increase for CEAS in fiscal year (FY) '89, $584,-000 was used to draw down federal funds for the mental-health needs of the homeless, and $616,000 was to be targeted to meet the goals of family shelter housing. And how will CEAS, which distributes funds largely to urban providers, assist the rural homeless?

In short, there are some questions that need to be answered in the plain language of the streets: who is in charge here and how is the problem to be solved?

In terms of specifics, DHS made certain concrete proposals in the February 14, 1989, memorandum that would aid "high impact municipalities" in dealing with what it regards as "the small number of EA recipients whose needs exceed the five month limit." The proposal plans to expend transitional grants of $437,500 to be matched by $145,833 from twelve high-impact municipalities to assist EA recipients in those municipalities. In sum, over $583,000 in new funds would be committed to the problem. "These grants would serve to support continued shelter placements, transportation, case management and the delivery of other emergency shelter services * * *."

It is difficult for us to grasp the full details of this program with the outline that has been presented. Presumably, this program would include such features as rent subsidies, deposits, finder's fees, and the like. The second feature of the program provides for a shelter hotline. This would be an informational network, alerting municipal welfare departments

to the availability of private shelters. The next feature of the program would be to furnish transportation to these shelters. (It is unknown whether this transportation from the municipality to the shelter includes daily or multiple trips.) The fourth feature is designed as an informational program for the GA clientele under which the responsible agency would explain to applicants other available benefits, such as Social Security disability benefits. This would help the homeless to take advantage of already-existing programs. The fifth proposal would take steps to increase the number of placements into residential health-care facilities. Obviously, many of the GA homeless are as much in need of health care as other services. And the sixth proposal would provide special assistance for the mentally ill and the terminally ill. This proposal refers to a $2.3 million mental-health block grant, which would aid DHS in providing services to the mentally ill. In short, the programs are promising. The difficulty we have here is that the described programs are still on paper, and as near as we can make out, have not been instituted. Yet, the record continues to change.

How then should we approach the legal problem that faces us? Should a court do nothing? The agency's central argument is that the EA program is essentially a discretionary program and that, therefore, it does not lie in the Court's province to tell the Commissioner how to exercise his discretion. The difficulty with this argument is that it applies as well with respect to the entire structure of the GA program. The Legislature, indeed, has not specified that there shall be a flat grant program; rather, it has left, as it so frequently does, enormous discretion in the agency of government to administer.

As noted, Public Assistance Law specifically provides that "[t]he extent of individual grants shall be determined in accordance with the standards and budgets authorized by the commissioner." *N.J.S.A.* 44:8–124. But delegation of the management of a program does not insulate the administration

of the program from any judicial review. In *Texter v. Department of Human Services*, 88 *N.J.* 376 (1982), we reviewed the validity of an eligibility standard of a medical-assistance program. We recognized "the difficult decisions confronting the Commissioner and the Legislature in trying, in a time of increasing costs, to continue essential human services with constant, or even reduced funds." *Id.* at 389. But we believed that "[o]ne measure of the validity of an administrative regulation is whether it is consistent with the expressed policy of the enabling statute and related legislation." *Id.* at 387. We thus remanded the matter of eligibility to the Commissioner for administrative proceedings consistent with our opinion. It was within this context that the Appellate Division concluded that the five-month expiration date was not in furtherance of the goals of the Legislature and remanded the matter to the Commissioner. 228 *N.J. Super.* at 538–41.

In sum, we are faced with a different situation from that which we faced in *Franklin*. In *Franklin*, the Commissioner had expressed before us an intent to exercise a supervising responsibility with respect to identifying funding and coordinating solutions to the problem of housing homeless families. He had not abandoned the children before the Court.

In that case, however, the programs were more firmly in place. The Legislature had recently enacted two bills appropriating funds for the new programs. Specifically, there was $3.65 million in new funds of which $1 million was authorized for county-level service agencies and $2.65 million to the Division of Public Welfare to assist EA families. *Franklin, supra,* 111 *N.J.* at 14. In this case, the Commissioner has proposed conditionally to expend $467,500 *if* we uphold the five-month EA regulation.

The GA problem appears to be manageable. The DHS stated in September 1988 that of the more than 20,000 individuals who were receiving GA benefits, 1,326, or 6.6%, were receiving EA benefits in addition to their monthly grants. As of September

1988, only forty EA recipients were in their final month of benefits. Except for nine persons, or 0.7% of the General Assistance EA population, all others, DHS claimed, had post-EA shelter arrangements.

In counterpoint, DHS observed:

> According to an estimate prepared by the Division of Public Welfare, 900 individuals received General Assistance EA in April 1988. That month's average grant was $450, and total expenditures for the month were $405,000, representing an annual expenditure rate of $4,860,000. Assuming the 5–month limitation remains, the Division projects a gradual rise in costs such that by June 1989 the monthly costs will be $469,531, representing an annual rate of $5,634,000. A projection based on an assumption of EA which is not time-limited predicts a sharp increase over the same period, attributable in part to lowered client incentive and increased attractiveness of EA as an option, such that by June 1989 projected EA costs would amount to $887,706, representing an annual expenditure rate of $10,652,400.

This one program, then, would represent almost 15% of the GA budget. *See infra* at 122. This would be a case of the tail wagging the dog. Moreover, would it not be unfair to the many stuck on the flat grant of $210 that some receive both the $210 grant and housing? Again, we quote the Commissioner:

> The problem of homelessness is a stark example of poverty amidst plenty. Allowing a generation of children to grow up in welfare hotels [or, as here, a generation of needy adults to live in welfare hotels] is not the solution to the problem. Trying to contort a program—emergency assistance—that was designed for an entirely different purpose into a solution to the low-income housing problem is a losing proposition. All of America is struggling with the tragedy of homelessness; we cannot address it through a limited, inappropriate welfare program. [Report to the Legislature, *supra*.]

It seems to us unwise then to invalidate the regulation on the basis of the record before the Appellate Division, namely, that there were not programs in place to make "reasonably certain" that the claimants would find shelter, and thus inviting another round of litigation after the Commissioner has set the new programs in place. The issue raised in *Williams* is a complex social problem handled by a myriad of state and municipal agencies. This case is "better resolved by a process or procedure that encourages an ongoing dialogue rather than by an inflexible decision * * *." Handler, "Social Dilemmas, Judicial

(Ir)resolutions," 40 *Rutgers L.Rev.* 1, 26 (1987). Hence, we shall issue a judgment that the regulation be deemed valid if, with the conditions noted hereafter, DHS shall have set in place by December 1, 1989, through proper administrative procedures, the new programs that it believes will make reasonably certain that the individuals previously housed in motels will find shelter and eventually housing elsewhere. We leave to the discretion of the agency the form of the agency procedures that will do this, either by a change in program directive or by a change in the regulations themselves. We also shall assume that in the interim, the Commissioner, as he did in *Franklin*, will issue one-time or more extensions of EA to handle emergent situations.

## IV

One of the issues that should be addressed in this administrative process is clarification of which agency has the ultimate responsibility to provide shelter of last resort. As we stated in *Franklin, supra,* confusion exists concerning which state agency, Department of Community Affairs, DHS, or county or local government, is ultimately responsible to provide shelter of last resort to the GA homeless. 111 *N.J.* at 19. In his 1988 Report to the Legislature on AFDC, Commissioner Altman stated:

> In New Jersey, services for the homeless have historically been a county and local responsibility. Prior to last year's changes in state emergency assistance policy, the majority of homeless AFDC families did not even qualify for emergency assistance benefits. Now, as we have seen, many more families do qualify. But this expansion constitutes a sharing of responsibility between the counties and the state, *not a shift in responsibility to the state.* [Report to the Legislature, *supra* (emphasis added).]

Does this mean that the State intends that the burden of sheltering the GA homeless be borne by county or local government, and, if so, by which unit of government? For example, by virtue of the CEAS legislation, does it follow that the counties have been assigned the responsibility to furnish shelter of last resort? DHS described CEAS as the "primary

122

vehicle for * * * homeless services planning throughout the
State." Recall that traditionally municipalities have been re-
garded as the primary agents for delivery of general-assistance
welfare. Obviously, the resources of municipalities have been
strained beyond the breaking point.

Second, some questions remain concerning what the new
programs entail, *i.e.*, is rent subsidy a "method" available to the
municipalities under a "county assistance" program, and if so,
how much money is available for that purpose? The Jersey
City Municipal Welfare Department informs us that although it
wished to furnish rent subsidies, it was forbidden to do so by
DHS, and was told that it would not be reimbursed for doing
so. Other municipal welfare departments report that DHS has
never communicated with them about how to handle EA cases
after the benefits expire.

Third, it should appear what "supervising responsibility,"
*Franklin, supra,* 111 *N.J.* at 20, DHS will exercise with respect
to the GA program. Recently, we have received supplemental
material indicating diversity among the counties regarding the
administration of the transitional one-year AFDC rent-subsidy
program. For example, we are told that one county initiated a
self-limiting policy by requiring that recipients demonstrate the
ability to meet the full rent on their own after the one-year
subsidy period is over. Should there be a uniform policy for
municipal welfare departments and would the State shelters
that have been provided for families be available to GA recipi-
ents?

Fourth, we should know whether the Human Services Com-
missioner's recently-instituted Emergency Assistance Reform
Initiative, a family-shelter strategy described in the Governor's
1989 Annual Message, includes the GA homeless, and if so,
how. Reportedly, $2.4 million in funds already allocated for aid
to the homeless under a joint DHS and Department of Commu-
nity Affairs initiative in the Family Shelter Strategy program
has not been spent. DHS, in a recent published account, details

its plans to obligate counties to spend the funds by September 30, 1989. Leusner, "$2.4 million homeless aid slowly wends way through system: Spending deadlines near as Essex awaits $642,000." The Star–Ledger, Jun. 28, 1989, at 22, col. 2.

The four-month or so extension of time will better determine how these programs work. Society has no interest in a process that shuffles the claimant from agency to agency in search of the bureaucratic official who is finally charged with responsibility to fulfill the commitment in the Prevention of Homelessness Act (1984), *N.J.S.A.* 52:27D–280 to 52:27D–287, that "[i]t is the longstanding policy of this State that no person should suffer unnecessarily from cold or hunger, or be deprived of shelter." *N.J.S.A.* 52:27D–281(a).

We realize that government cannot achieve the impossible and that despite the best of efforts, some people will indeed slip through the net. But it should not be because there has been an administrative misunderstanding about the respective roles of the agencies of government and the programs that they administer. The danger that we face with the depersonalization of government is that program manuals, and not people, will decide when government can do no more.

If the executive and legislative branches decide that they can do no more, it is within their province to suspend a statutory mandate. *See City of Camden v. Byrne*, 82 *N.J.* 133, 149, 153–55 (1980) ("There can be no redress in the courts to overcome either the Legislature's action or refusal to take action pursuant to its constitutional power over state appropriations."). But we do not sense that the two branches have reached that point despite their disagreement about the means to reach the end. (In FY '89 Budget, the Legislature requested DHS to adopt rules establishing a "standard of need" for both the GA and AFDC programs, language that the Governor later deleted. *L.* 1988, *c.* 47.)

No more direct declaration of the rights of these claimants has been furnished than by our Governor:

> I believe that, with these steps, our state and our society can move toward the goal outlined by the Task Force, namely that "all persons, regardless of fault, are entitled to the basic human needs for shelter and food and it is the obligation of government to insure that these needs are met." [*Report of the Governor's Task Force on the Homeless* Appendix C (Oct.1985), *quoted in Franklin, supra,* 111 *N.J.* at 19.]

We do not intend in any way to minimize the difficult choices that government must make in allocating its finite resources. For FY 1989–90, the Governor requested a $2,276,897 increase in the EA program 1990 budget over the FY 1989 budget. Although the GA recipient population is expected to decrease, the increase in appropriations requested is motivated by increases anticipated in hospitalization costs and increases in the average monthly grant up to $330. This $65,916,632 program request has increased by 21% from the FY 1986 GA program. The budget exhibits do not, however, break down the homeless effort between the GA and AFDC, nor indeed between the various departments, but the overall statement of budget funding for the homeless forecasts $62,000,000 for FY 1990. *See* Exhibit A (charting increases in homeless funding since 1984).

In his annual message, Governor Thomas H. Kean recalled that he had "asked Human Services Commissioner Drew Altman to make the phase-out of welfare hotels as one of his top priorities," asserting that "there is a better way to use tax dollars than to line the pockets of a few fortunate hotel owners." Gov. Thomas H. Kean, *Annual Message to the Legislature: New Jersey's Quiet Revolution* 106 (1989). The Commissioner has responded with the Emergency Assistance Reform Initiative, a three-year program designed to "phase out welfare hotels as quickly as possible and replace them with various forms of transitional housing and family shelter." *Ibid.* Recalling Robert Frost, the Governor observed that "home is 'the place where, when you go there, they have to take you in.'" *Ibid.* He surely intends that every citizen of New Jersey has a place to go where they must take you in. As the Governor expressed, "[w]e don't do this because it is good public relations. We do it because it is the right thing to do for families in need." *Ibid.*

In light of these continuing efforts, we do well to hesitate to invalidate a program before it has been tried. In his concurrence in *Switz v. Township of Middletown,* 23 *N.J.* 580, 607–08 (1957), then-Justice Weintraub reminded us of the proper time for judicial deference:

> None of us is happy about the spectacle of a constitution or a statute ignored. But there is no appropriate whipping boy, neither the five million citizens of our State nor the assessors who fell heir to this extraordinary problem. Although

ultimately we must act, yet it is equally our duty to give our citizens a decent opportunity to seek an orderly solution of the manifold problems through their elected representatives or by constitutional amendment if they should conclude one to be necessary and desirable.

We should afford our elected representatives a similar opportunity to test the solutions they propose for this extraordinary problem of the homeless among us.

## V

We reverse the judgment of the Appellate Division invalidating the five-month expiration date of the EA assistance regulation. This judgment shall become final and the regulation's validity confirmed if within the period stated the Department shall have set in place the proposed administrative changes and financial commitments that are "to make reasonably certain that [the EA claimants] previously housed in motels will find shelter and eventually housing elsewhere." *Franklin, supra,* 111 *N.J.* at 20.

## APPENDIX A

## FUNDING FOR HOMELESS PROGRAMS

### ( in millions )

■ FEDERAL　　　　　■ STATE

[Gov. Thomas H. Kean, New Jersey Fiscal Year 1989-1990 Budget: Budget Message and Taxpayers Guide 107 (1989).]

STEIN, J., concurring.

I join in the Court's thoughtful and pragmatic disposition of this appeal. I write separately only to record my view that the

Court should retain jurisdiction of this case in order to determine whether the action to be taken by the Department of Human Services meets the standard set forth in the Court's opinion, *ante* at 257.

STEIN, J., concurring with separate opinion.

*For reversal*—Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.